UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

SCARLETT PAVLOVICH,

          Plaintiff,

v.                                  Case No. 25-CV-00078-jdp

NEIL GAIMAN and
AMANDA PALMER,

          Defendants.

## DEFENDANT NEIL GAIMAN'S BRIEF IN SUPPORT OF MOTION TO DISMISS

Defendant Neil Gaiman ("Defendant" or "Gaiman") by and through his attorneys, Kravit, Hovel & Krawczyk, s.c. and Berk Brettler LLP, submits this Brief in Support of his Motion to Dismiss the Complaint against him filed by Plaintiff Scarlett Pavlovich a.k.a. Scarlet Wynter, a.k.a. Molly Pavlovich ("Plaintiff" or "Pavlovich").

## INTRODUCTION & RELEVANT BACKGROUND[1]

Plaintiff's claims are a sham. Her lawsuits against Gaiman and his wife, Amanda Palmer ("Palmer"), one filed here and two with nearly identical allegations in federal courts in Massachusetts and New York, appear to be strike suits–the

---

[1] Normally matters outside the Complaint are not considered on motions to dismiss. There are exceptions applicable here. Plaintiff makes scandalous allegations that can be stricken, Fed. R. Civ. P. 12(f), and important facts can be considered for illustrative purposes. *See, e.g., Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Such facts discussed here are supported by the declaration of Gaiman, filed herewith and incorporated herein. Facts outside the Complaint are also appropriate to consider on Gaiman's motion to dismiss for *forum non conveniens*. Forum Non Conveniens—In General, 14D Fed. Prac. & Proc. Juris. § 3828 (4th ed.). *See also* n. 7, *infra*.

culmination of her plan to maximize adverse publicity against Gaiman, a well-known author.[2]

To begin, all the facts set forth in the 365 paragraph Complaint took place in the country of New Zealand, where Plaintiff is a citizen and Gaiman has permanent residency.[3] Plaintiff, an adult and former friend of Palmer's, who previously house-sat for Palmer in New Zealand, began babysitting Gaiman and Palmer's son, at Palmer's request, in early 2022. Plaintiff and Gaiman began a brief personal relationship, which involved consensual physical intimacy, not sexual intercourse. Gaiman did not engage in the outrageous and tortious conduct Pavlovich alleges in her Complaint or in her myriad media interviews.   In no uncertain terms, Pavlovich's accusations are false. The sexual scenarios she describes deliberately in graphic detail are invented. Any sexual conduct that occurred was in all ways consensual.  Law enforcement authorities in New Zealand thoroughly investigated the same claims Plaintiff makes here, found no merit, and declined to file any charges against Gaiman. There was no credible evidence of wrongdoing.

No matter what Plaintiff says happened, it all happened in New Zealand between a New Zealand citizen and a New Zealand permanent resident. There is no

---

[2] The Court may take judicial notice that Plaintiff sought extra judicial publicity for her alleged claims before filing them in court, including by participating in an article for *New York Magazine* (https://nymag.com/press/article/on-the-cover-the-side-of-neil-gaiman-his-fans-never-saw.html), *UnHerd*  (https://unherd.com/2024/09/bad-omens-for-neil-gaiman/), and the *Tortoise* podcast series (https://www.tortoisemedia.com/listen/master-the-allegations-against-neil-gaiman).       Plaintiff's coordination of press coverage with this and multiple federal court filings makes this case a strike suit, meant to publicly punish Gaiman's reputation as an author and creator, and force a non-deserved settlement.

[3] The summary facts that follow are from the Gaiman declaration, attached hereto and made a part hereof.

legal authority to adjudicate her lawsuit in federal court in Wisconsin, or in other federal courts around the United States.[4] Pavlovich's claims are false, but there is no dispute that all of the conduct **alleged** in the Complaint occurred in New Zealand, the proper forum, if any, for this lawsuit.

Gaiman has contemporaneous written correspondence (WhatsApp messages) he exchanged with Plaintiff. Those messages tell a very different story than the one Plaintiff pleads in this Complaint.[5] The parties' correspondence reflects not only that Gaiman's alleged conduct was consensual, but also on many occasions, it was initiated and/or encouraged by Plaintiff herself. At no point in any of Plaintiff's messages to Gaiman did she ever accuse him of misconduct. Any suggestion that Gaiman raped or otherwise engaged in violent or non-consensual activity with Plaintiff, at any time, is false and defamatory.

In early February 2022, while living in New Zealand, Palmer hired Plaintiff to babysit her and Gaiman's son. Gaiman Decl. ¶ 5. On February 4, 2022, Plaintiff and Gaiman shared a meal together in the garden outside of Gaiman's home on Waiheke Island, New Zealand. *Id.* ¶ 6. In the garden, there was an outdoor bathtub with a hot water hose attached. *Id* at ¶ 7. After eating, Gaiman invited Plaintiff to take a bath with him. *Id*. He was clear that the invitation was to take a bath **with**

---

[4] This Court should take judicial notice that the same or similar complaint has been filed by Plaintiff against defendant Palmer in federal courts in New York and Massachusetts. *See Pavlovich v. Palmer*, No. 25-cv-00969 (S.D.N.Y. filed Feb. 3, 2025); *Pavlovich v. Palmer*, No. 25-CV-10263F (D. Mass. filed Feb. 3, 2025).

[5] *See* Declaration of Neil Gaiman, dated March __, 2025, and the exhibits attached thereto, incorporated herein by reference. Exhibits A and B to the Gaiman declaration are a true and correct copies of the correspondence exchanged between Gaiman and Pavlovich.

*him*, and it was entirely open for Plaintiff to decline the invitation. *Id*. She accepted. *Id*. Gaiman and Pavlovich had a lengthy conversation about consent, during which Pavlovich disclosed that she preferred older partners and was open to a sexual relationship with Gaiman. *Id*.   Thereafter, Gaiman and Plaintiff removed their clothes before getting in the bath. *Id*. Gaiman and Plaintiff cuddled and "made out" in the bath before engaging in further sexual activity—although ***not*** sexual intercourse of any kind—when they returned to the house. *Id*. At no point during the evening did Plaintiff say or do anything that gave Gaiman any indication that she was not willingly participating in these activities. *Id*.

Plaintiff's text messages to Gaiman the following morning, February 5, 2022, demonstrate as much: "*Thank you for a lovely lovely night ~ wow x*".



> 05/02/2022
>
> Mōrena Neil 🤎 🧡 who can believe it, I have woken up with what I think is a broken toe......... and it's rather unbecoming...... I am crawling around like a little ant! I know it sounds completely strange because well it just is. Or else it is a bee sting or something because it's very swollen and I can't really walk. I am going to put some ice on it and take some anti inflammatories & fingers crossed. Happy to come around whenever this morning for ash - but I'm afraid cycling might be off the cards with my damned toe. I feel like an invalid. Thank you for a lovely lovely night ~ wow x        08:48
>
> Aha ~ not a broken toe....a bloody bee sting!!  09:22

*Id*. ¶ 9, Ex. A at 2. In the messages she sent him over the next two days, it was Plaintiff who wanted to bathe with Gaiman again: "*Do you feel like a rain bath :) . . . Let me know if you want me to run a bath. I am consumed by thoughts of you . . . . I hope tomorrow, or some other time soon [heart on fire emoji]*"



> 06/02/2022
>
> Leaving soon. Do you feel like a rain bath:) if it's still raining ....  23:27

*Id.*, Ex. A at 3.

Then on February 9, 2022, Plaintiff messaged Gaiman to ask whether she could spend the night with him at his home: "*If you happen to be alone later tomorrow night and are struck by an adventurous impetus, maybe I could come for a visit and then vanish in the morning for work like an apparition . . . . I'm at your service. You've made me a bit of a greedy girl : )*"



*Id.* at 4.

More than a month later, Gaiman confronted Plaintiff about rumors that he heard from Palmer regarding Plaintiff's purported allegation of sexual assault. On March 24, 2022, Gaiman texted Plaintiff to express his disbelief and devastation over her allegation. Within minutes, Plaintiff responded, "*Oh my God. Neil! I never said that . . . . Rape? WHAT? This is the first I have heard of this. Wow. I need a moment to digest your message.*"



*Id.* at 13.

5

Two days later, on March 26, 2022, Plaintiff again said that the sexual assault claim was "*absolutely not true*" and that the intimate contact she had with Gaiman was "*consensual (and wonderful)!*" She expressed her frustration and anger towards the person or persons she blamed for the rumors getting "*out of control*," Plaintiff emphatically concluded, "*It was consensual – how many times do I have to fucking tell everyone.*"



*Id.* at 16.

Much later, Plaintiff apparently reported this activity to law enforcement authorities in New Zealand. Gaiman Decl. ¶ 13. Her allegations were thoroughly investigated by New Zealand police, and, based on her own statements in the above quoted messages to Gaiman as noted above, no charges were brought. *Id.* In early April 2024, the New Zealand police closed the investigation. *Id.*

After participating in a multi-part podcast in which she discussed her allegations against Gaiman in lurid detail, Plaintiff filed this Complaint alleging common law claims against Gaiman and his wife for assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and violations of 18 U.S.C. §§ 1589, 1590(a), 1591, and 1594. The lengthy, scattershot

complaint (365 paragraphs!) describes alleged conduct that occurred, if at all, entirely within the country of New Zealand, and therefore in that jurisdiction.[6]

This Complaint must be dismissed because: (1) under the doctrine of *forum non conveniens*, New Zealand is the most appropriate forum to adjudicate these alleged claims; (2) the Complaint fails to state a claim because the civil remedy provision of the Trafficking Victims Protection Act (the "TVPA"), 18 U.S.C. § 1595, does not have extraterritorial effect; (3) the Plaintiff has not exhausted New Zealand's available remedies prior to bringing a lawsuit in the United States; and (4) international comity principles require dismissal here. When the federal statutory claims are dismissed, the common law tort claims must also be dismissed for lack of supplemental jurisdiction.

The Complaint and the Gaiman declaration filed herewith and incorporated herein,[7] demonstrate that the vast majority of non-party witnesses and evidence are in New Zealand—8,296 miles away from the Western District of Wisconsin. Gaiman Decl. ¶ 10. The exhibits to the Gaiman declaration include several

---

[6] Plaintiff's bizarre pleading style does not "promote clarity" and violates Rule 10(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 8(a)(2) (requiring Plaintiff to provide "a short and plain statement of the claim showing that the pleader is entitled to relief"; *Stanard v. Nygren*, 658 F.3d 792, 798 (7th Cir. 2011) (holding dismissal is an appropriate remedy for complaints that do not satisfy federal pleading standards). It is obvious this Complaint is more of a press release than a short and plain statement of purported claims. *Givens v. City of Wichita*, No. 23-cv-01033-HLT-TJJ, 2024 WL 1198503 at *4 (D. Kan. Mar. 20, 2024) (holding "[s]omething labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint.").

[7] It is permissible to consider evidence outside the pleadings as it relates to whether the Western District of Wisconsin is a *forum non conveniens. Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014). Likewise, a court can rely on outside documents that are integral to and relied upon in the complaint and are authentic. *Schmidt v. Kolas,* 770 F. 3d 241, 249-50 (3d Cir. 2014). Finally, a court may take judicial notice of matters of public record when deciding a motion to dismiss. *Lee v. City of L. A.*, 250 F.3d 668, 689 (9th Cir. 2001); Fed. R. Evid. 201.

material messages from Plaintiff in which she told numerous witnesses in New Zealand that her relationship with Gaiman was consensual. For example:



> I am so angry I have no words. Not at you. Neil, I'm so sorry. Fuck going to Waiheke. I'm livid with everyone. This is beyond out of control and as I said I only have fondness and kindness for you. It was consensual - how many times do I have to fucking tell everyone.
>
> 12:53

Gaiman Decl. ¶ 9, Ex. A at 16.

And at another time:



> I'm just out for coffee so I can't text but yes we did, and it was consensual (and wonderful)! Misma has been triggered by something I think.
>
> 12:21

*Id.*, Ex. A. at 16.

Allowing Plaintiff to bring her claims here in the Western District, based on alleged misconduct that occurred entirely within New Zealand prejudices Gaiman, among other ways, by limiting his access to witnesses and evidence, greatly increasing the costs of this litigation, thus handicapping his defense. This ground for dismissal is further argued at pages 10-23, *infra*.

The TVPA claims must also be dismissed under Rule 12(b)(6) for failure to state a claim. The claims rely on the TVPA's civil remedy provision, 18 U.S.C. § 1595, to confer jurisdiction here for foreign conduct and foreign injuries. While courts disagree whether the TVPA's civil remedy has extraterritorial reach, the application of the presumption against extraterritoriality and U.S. Supreme Court case law lead to only one conclusion—§ 1595 does not contain the clear indication

from Congress necessary to exercise extraterritorial jurisdiction. That ground for dismissal is discussed at pages 23-33, *infra*.

Another fatal flaw is that the Complaint fails to demonstrate that Plaintiff has exhausted her remedies under New Zealand law prior to bringing this suit in the United States. The Seventh Circuit requires that the prudential exhaustion rule must be applied to transnational litigation. This Complaint simply states that Plaintiff filed a police report, and the "police took no action." Compl. ¶¶ 248-53. The Complaint does not allege that the plaintiff brought a civil action against Gaiman in New Zealand, which is an adequate and available remedy in that jurisdiction. The exhaustion rule requiring dismissal here is argued at pages 33-36, *infra*.

Finally, international comity is a major factor in determining jurisdiction to resolve foreign disputes. Comity also militates strongly in favor of dismissing this Complaint. New Zealand has a strong interest in adjudicating this case, and restraint must be exercised in deciding whether this Court should adjudicate a case brought by a New Zealand citizen, against a New Zealand resident[8], alleging conduct occurring entirely within New Zealand. New Zealand has comprehensive laws governing the claims Plaintiff alleges, either through its criminal human trafficking statutes (that provide for restitution), international anti-human trafficking treaties New Zealand has ratified (i.e., the Palermo Accords), or through

---

[8] Neil Gaiman is a permanent resident of New Zealand. Gaiman Decl. at ¶ 3.

its common law derived from the same English common law system that is the basis for common law in the USA. This factor is discussed at pages 36-37, *infra*.

If this Court dismisses the statutory claims, all claims brought under § 1367 should also be dismissed for lack of supplemental jurisdiction. 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction.").

## ARGUMENT

### I.     THE DOCTRINE OF *FORUM NON CONVENIENS* DICTATES THAT THE UNITED STATES IS NOT THE PROPER FORUM FOR PLAINTIFF'S ALLEGATIONS.

Under the *forum non conveniens* doctrine, New Zealand is the proper forum for Plaintiff's claims, not the Western District of Wisconsin. This case must be dismissed because: (1) this forum would impose an undue burden on Gaiman's access to witnesses and evidence; (2) New Zealand has adequate and available remedies; (3) Plaintiff consented to jurisdiction in New Zealand and the application of New Zealand law; and (4) public interest factors overwhelmingly support dismissal in favor of a New Zealand forum. This case is brought by a New Zealand citizen, against a New Zealand resident, alleging conduct occurring entirely within the jurisdiction of New Zealand. If the case should be heard anywhere, it should be heard in the courts of New Zealand rather than in the Western District of Wisconsin.

### A.  Legal standard—*forum non conveniens*

"Dismissal for *forum non conveniens* reflects a court's assessment of a range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425, 127 S. Ct. 1184, 1188, 167 L. Ed. 2d 15 (2007) (internal quotation omitted). A federal court "need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) or personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case." *Id.* Further, because Plaintiff chose to bring these claims in the United States rather than in her home forum, any presumption in Plaintiff's favor must carry less weight:

> "A defendant invoking *forum non conveniens* ordinarily bears a heavy burden in opposing the plaintiff's chosen forum. When the plaintiff's choice is not its home forum, however, the presumption in the plaintiff's favor applies with less force, for the assumption that the chosen forum is appropriate is in such cases less reasonable."

*Id.* (internal quotations omitted). Courts assessing motions to dismiss on *forum non conveniens* grounds most often rely on parties' affidavits rather than requiring extensive discovery. § 3828 Forum Non Conveniens—In General, 14D Fed. Prac. & Proc. Juris. § 3828 (4th ed.)

The *forum non conveniens* analysis requires a balancing test based on private and public interest factors. "Courts look to four private interest factors when evaluating the viability of an alternative forum." *Instituto Mexicano del Seguro Social v. Zimmer Biomet Holdings, Inc.*, 29 F.4th 351, 359 (7th Cir. 2022). These include the "(1) relative ease of access to sources of proof; (2) availability of

11

compulsory process and costs for attendance of witnesses; (3) possibility of viewing the premises, if appropriate; and (4) other practical issues, including the ease of enforcement of any ultimate judgment." *Id.* (internal quotations omitted). Courts address the following public interest factors: (1) the administrative issues arising from court congestion; (2) the local interest in having local disputes decided at home; "(3) the avoidance of unnecessary problems in conflicts of laws or in the application of foreign law; and (4) the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* at 360 (internal quotations omitted).

## B. The Complaint and Gaiman declaration show that the witnesses and evidence are concentrated in New Zealand.

In the present case, the vast majority of witnesses and evidence identified in either the Complaint or the declaration of Neil Gaiman are located in New Zealand. For example, the exhibits to the Gaiman declaration include numerous text messages where Plaintiff discusses telling other people that her relationship with Neil was consensual:

> I am so angry I have no words. Not at you. Neil, I'm so sorry. Fuck going to Waiheke. I'm livid with everyone. This is beyond out of control and as I said I only have fondness and kindness for you. It was consensual - how many times do I have to fucking tell everyone.
>
> 12:53

*E.g.*, Gaiman Decl. ¶ 9, Ex. A at 16. This text message demonstrates that a proper defense of Plaintiff's allegations would require discovery from several people located on the island of Waiheke—a remote island located in New Zealand—whom Plaintiff told her relationship with Mr. Gaiman was consensual.

The Complaint identifies numerous witnesses who reside in New Zealand and alleges conduct that was observed or discussed, if at all, by witnesses residing in New Zealand or elsewhere outside of the United States. For example, the Complaint alleges actions that took place on the island of Waiheke, which is accessible only "via a forty-minute ferry ride." Compl. ¶ 26. According to the Complaint, while on Waiheke, Gaiman left his child at a friend's house while the first alleged assault transpired. *Id.* ¶¶ 53-105. Further, the Complaint describes Plaintiff's vulnerability by alleging that "she had no other job," *Id.* ¶ 203, "she had no other residence," *Id.* ¶ 202, "she had nowhere to go," *Id.* ¶ 201, she "could not easily afford transport off the island," *Id.* ¶ 209, and various other claims that Plaintiff was financially coerced by Gaiman. *Id.* ¶¶ 200-15. The Complaint also alleges that Plaintiff filed a police report and that "the police took no action because Palmer refused to talk to them." *Id.* ¶ 253. Contesting these allegations will require testimony from witnesses who reside well-outside of the Court's jurisdiction.

The Complaint demands relief "believed to be in excess of $1,000,000.00" for each of seven separate causes of action. *Id.* ¶¶ 287, 295, 305, 312, 317, 346, and 364. These causes of action cite emotional and psychological damages, physical impairment damages and PTSD, anxiety, depression, physical impairments of the brain, and loss of career opportunities. *Id.* Further, the allegations are that Plaintiff "was put in a psychiatric respite center to treat her suicidal ideation." *Id.* ¶ 234. The witnesses, treating professionals, records, and other evidence related to those alleged

damages are all in the jurisdiction of New Zealand. The chart below details potential

witnesses identified in either the Complaint or in Mr. Gaiman's declaration:

| EVIDENCE/ WITNESSES | CITATION | LOCATION OF WITNESS | ANTICIPATED TESTIMONY |
|---|---|---|---|
| Guests at Amanda Palmer's home on Waiheke Island | Compl. ¶ 24 | Waiheke Island, New Zealand | Observed interactions between parties |
| Individuals familiar with Plaintiff | Compl. ¶¶ 30, 31, 33, 34, 35 | New Zealand | Plaintiff's claims of economic insecurity, mental disorders, and character witnesses |
| Ferry company employees and records | Compl. ¶¶ 26, 27, 41, 42 | Waiheke Island and Auckland, New Zealand | Verify presence of parties on Waiheke at specific dates/times |
| Individuals who watched Gaiman's child | Compl. ¶¶ 49, 53 | Waiheke Island, New Zealand | Dispute facts about Plaintiff's allegations of assault |
| Hotel employees and records | Compl. ¶ 159 | Auckland, New Zealand | Dispute Plaintiff's claims of hotel assault |
| Plaintiff's bank records | Compl. ¶¶ 29, 113, 182, 204, 240, 245 | New Zealand | Dispute claims Plaintiff was not paid for nanny services |
| Plaintiff's friends | Compl. ¶ 238 | New Zealand | Dispute assault claims |
| Police department employees and records | Compl. ¶¶ 248, 253 | New Zealand | Dispute claims of assault |
| Medical records and treatment professionals | Compl. ¶¶ 234, 255 | New Zealand | Dispute damages claim |
| M.A. | Gaiman Decl. ¶ 10(a) | New Zealand | Friend of Plaintiff who perpetuated the false claims |
| R.C. | Gaiman Decl. ¶ 10(b) | New Zealand | Gaiman's assistant during the relevant time period, who has information about Plaintiff's false allegations |
| H.H. | Gaiman Decl. ¶ 10(c) | Waiheke Island, New Zealand | Neighbor on Waiheke who can dispute Plaintiff's false claims |

| EVIDENCE/ WITNESSES | CITATION | LOCATION OF WITNESS | ANTICIPATED TESTIMONY |
|---|---|---|---|
| E.A. | Gaiman Decl. ¶ 10(d) | Waiheke Island, New Zealand | Neighbor on Waiheke who can dispute Plaintiff's false claims |
| S.E.B. | Gaiman Decl. ¶ 10(e) | New Zealand | Realtor who can testify about the property referenced in the complaint |
| X.O. | Gaiman Decl. ¶ 10(f) | Melbourne, Australia | Personal assistant who can dispute plaintiff's false claims |
| E.B. | Gaiman Decl. ¶ 10(g) | New Zealand | Personal assistant who can dispute Plaintiff's false claims |
| V.S. | Gaiman Decl. ¶ 10(h) | New Zealand | Son's nanny during the relevant time who can dispute plaintiff's false claims |
| L.B. | Gaiman Decl. ¶ 10(i) | New Zealand | Housekeeper who can dispute plaintiff's false claims |
| D.C. | Gaiman Decl. ¶ 10(j) | New Zealand | Friend of Plaintiff whose mother was Plaintiff's landlord and can dispute Plaintiff's false claims |
| K. | Gaiman Decl. ¶ 10(k) | New Zealand | M.A. partner, who allegedly spoke with Pavlovich and M.A. about Gaiman |
| P.B.G. | Gaiman Decl. ¶10(l) | New Zealand | M.A. friend and purported expert, who allegedly spoke with Pavlovich and M.A. about Gaiman |
| E.S. | Gaiman Decl. ¶ 10(m) | New Zealand | M.A. friend, who allegedly spoke with Pavlovich and M.A. about Gaiman |

**C. The expense and lack of compulsory processes in New Zealand to obtain discovery prevent an adequate and fair defense to the allegations.**

Conducting the requisite discovery in this case will be severely burdened if litigation occurs outside of New Zealand. As most of the material witnesses reside in New Zealand and are presumed to be foreign nationals, subpoena power under the Federal Rules of Civil Procedure will be inapplicable. *See* Fed. R. Civ. P. 45(b)(3) and 28 U.S.C. § 1783 (granting extraterritorial subpoena power only for ***nationals and residents*** of the United States). Further, New Zealand is not a party to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.[9]

Because neither the Federal Rules of Civil Procedure nor the Hague Convention can be used to compel discovery in New Zealand, Defendant will be forced to use New Zealand's domestic laws to obtain testimony and the production of documents necessary to his defense. A review of the relevant New Zealand statutes demonstrates that the available procedures will not allow process to compel the type of discovery essential to litigation in the United States.

Discovery in New Zealand is governed by New Zealand's Evidence Act of 2006—Sections 184-87. Section 186 specifically provides: "A person may not be compelled by an order . . . to give any evidence that the person could not be compelled to give . . . in civil proceedings in New Zealand." Evidence Act, 2006 § 186 (NZ).[10] According to the U.S. State Department website, compulsory depositions are not

---

[9] *See* list of signatories: https://www.hcch.net/en/instruments/conventions/status-table/?cid=82 (last visited February 18, 2025).

[10] https://www.legislation.govt.nz/act/public/2006/0069/latest/whole.html#DLM394297 (last visited February 18, 2025).

permitted in New Zealand: "Voluntary depositions may be conducted in New Zealand regardless of the nationality of the witness, provided no compulsion is used."[11] Further, the possibility of discovery is not guaranteed as it will only be granted at the discretion of New Zealand's High Court. Evidence Act, 2006 § 184 (NZ).

Because of these discovery limitations, Defendant would be forced to use multiple U.S. and international lawyers to navigate a foreign system of discovery outside the typical international conventions. Not only would this incur major expense, but discovery could be severely curtailed due to New Zealand's lack of a compulsory process for discovery tools such as depositions. Adhering to foreign discovery laws would lengthen the discovery process and limit this Court's power to resolve discovery disputes. The expenses of travel will present yet another large financial burden to Gaiman's defense. New Zealand is an adequate and available forum for the remedies sought.

Only in "rare circumstances, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative." § 1:827. 1A Fed. Proc., L. Ed. § 1:827 (citing *Aenergy, S.A. v. Rep. of Angol.*, 31 F.4th 119 (2d Cir. 2022), *cert. denied*, 143 S. Ct. 576, 214 L. Ed. 2d 341 (2023)).[12] The Supreme Court and the Seventh Circuit have held that an "alternative forum is inadequate only where 'the remedy provided' is 'so clearly inadequate or

---

[11] https://travel.state.gov/content/travel/en/legal/Judicial-Assistance-Country-Information/NewZealand0.html (last visited February 18, 2025).

[12] *See also Carijano v. Occidental Petrol. Corp.*, 643 F.3d 1216 (9th Cir. 2011); *Lodakis v. Oceanic Petrol. S.S.Co.*, 223 F. Supp. 771 (E.D. Pa. 1963); *Flota Maritima Browning De Cuba, Sociadad Anonima v. Ciudad De La Habana*, 181 F. Supp. 301 (D. Md. 1960).

unsatisfactory that it is no remedy at all.'" *Inst. Mex.*, 29 F.4th at 358 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254, 102 S. Ct. 252, 70 L.Ed.2d 419 (1981)). The treatise on Federal Procedure expounds further:

> The lack of any right to a jury trial in the foreign forum does not render the alternative forum an inadequate one. Delays in an alternative forum's judicial system are not sufficiently harmful of due process to prevent dismissal on forum *non conveniens* grounds. Differences in the available relief also make no difference. Thus, the prospect of a lesser recovery does not justify refusing to dismiss an action on the ground of *forum non conveniens*, provided that the essential subject matter of the dispute can be adequately addressed by the foreign court. Even where relief is not as comprehensive or as favorable as a plaintiff might obtain in an American court, the alternative forum may still be adequate.

§ 1:827. 1A Fed. Proc., L. Ed. § 1:827.[13]

Plaintiff is a New Zealand citizen, and the more convenient forum is New Zealand. New Zealand and the United States have similar judicial systems (apart from the differing discovery processes noted), as both are based on English common law.[14] New Zealand has a comprehensive statutory framework similar to the TVPA and human trafficking has been a crime in New Zealand since the passage of the Crimes Act of 1961. Crimes Act, 1961 § 98D (NZ). In 2002, New Zealand ratified the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children ("Palermo Protocol")—three years before the U.S. ratified the Palermo Protocol. Finally, civil actions are available through the New Zealand Disputes Tribunal and have been awarded to victims of trafficking.

---

[13] *Inst. Mex.*, 29 F.4th 351; *Lockman Found. v. Evangelical All. Mission*, 930 F.2d 764 (9th Cir. 2022); *Broad. Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.*, 708 F. Supp. 83 (S.D.N.Y. 1989); *de Melo v. Lederle Labs., Div. of Am. Cyanamid Corp.*, 801 F.2d 1058 (8th Cir. 1986).

[14] Devin M. Smith, *Thin Shields Pierce Easily: A Case for Fortifying the Journalists' Privilege in New Zealand*, 18 Pac. Rim L. & Pol'y J. 217, 232 (2009).

Coppedge, Susan. *People Trafficking: An International Crisis Fought at the Local Level* (Fulbright July 2006)[15].

### D. Plaintiff consented to resolve all disputes in New Zealand under New Zealand Law.

Plaintiff herself agreed to resolve all disputes arising out of her independent contractor agreement in New Zealand, under New Zealand law. She alleges that she and Gaiman entered into an employment agreement. Compl. ¶ 242. But the document she signed says otherwise. She was an independent contractor. Gaiman Decl. ¶ 12, Ex. C at 1, 3. That independent contractor agreement (the "Agreement") contains a number of terms, including confidentiality, *Id*. at 4, a dispute resolution provision, *Id*. at 6, and a choice of law provision. *Id*. at 7. The Agreement's choice of law provision states:

> **16.   GOVERNING LAW AND JURISDICTION**
>
> This agreement is governed by New Zealand law.  The parties submit to the exclusive jurisdiction of the New Zealand courts in respect of all matters relating to this agreement.

*Id.* at 7.

When a district court exercises diversity jurisdiction, it must apply the choice-of-law principles of the state in which it sits. *Tanner v. Jupiter Realty Corp.*, 433 F.3d 913, 915 (7th Cir. 2006). Under Wisconsin's choice-of-law principles, a contractual choice-of-law provision will be enforced so long as enforcement does not contravene "'important public policies of the state whose law would be applicable if

---

[15] https://www.nzpc.org.nz/pdfs/Coppedge,-S-(2006,-People-trafficking-An-International-Crisis-Fought-at-the-Local-Level.pdf

the parties' choice of law provision were disregarded.'" *Drinkwater v. Am. Family Mut. Ins. Co.*, 290 Wis. 2d 642, 652, 714 N.W.2d 568 (2006) (*quoting Bush v. Nat'l Sch. Studios, Inc.*, 139 Wis. 2d 635, 407 N.W.2d 883 (1987)). But before a court can determine whether enforcing the choice-of-law clause would contravene important public policies of the state whose law would otherwise apply, the court must perform a choice-of-law analysis and identify the otherwise-applicable law. *Id*. at 654.

   In Wisconsin, "the law of the forum should presumptively apply unless it becomes clear that nonforum contacts are of the greater significance." *Id*. at 658 (*quoting State Farm Mut. Auto. Ins. Co. v. Gillette*, 251 Wis. 2d 561, 641 N.W.2d 662 (2002)). Wisconsin courts select the law of the state "with which the contract has its most significant relationship." *Gillette*, 251 Wis. 2d at 577. Wisconsin courts consider (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the respective domiciles, places of incorporation and places of business of the parties." *Sybron Transition Corp. v. Sec. Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir.1997). This analysis is qualitative, not quantitative. *Id*. Here, every factor shows that New Zealand law is the proper choice of law. The place of contracting was in New Zealand, the negotiations took place in New Zealand, the Agreement was performed in New Zealand, the Agreement was for the performance of childcare duties, which were to take place in New Zealand, and at the time of contracting and of the execution of the Agreement, both parties were residing in New Zealand. Gaiman Decl. ¶ 11. Under Wisconsin choice of law analysis, New Zealand law applies to the Agreement.

Wisconsin is a *forum non* conveniens. This Court should respect the parties' intention to submit to the exclusive jurisdiction of New Zealand.

### E.  Public interest factors.

The relevant public policy issues weigh heavily in favor of a New Zealand venue. The majority of the Plaintiff's claims arise through common law torts such as assault, battery, negligence, and intentional infliction of emotional distress. Compl. ¶¶ 313-64. These common law tort claims allege conduct occurring entirely within New Zealand and are brought here only through supplemental jurisdiction. *Id.* ¶ 7. New Zealand has statutes analogous to the TVPA which address Plaintiff's statutory claims. *See, e.g.*, Crimes Act, 1961 § 98D (NZ). Because New Zealand has enacted remedies to protect its residents from the same or analogous claims as those the Plaintiff seeks in the United States, it has a strong interest in adjudicating these allegations.

New Zealand's interest in providing protection and precedent within its own borders and legal system for conduct to which its laws apply that wholly occurred within its jurisdiction is paramount. This same comparison was drawn in *Capital Markets International, Ltd. v. Geldermann*, 182 F.3d 921 (7th Cir. 1999). The *Geldermann* court was faced with a case in which Illinois citizens were alleged to have defrauded British citizens in the United Kingdom. The court held that while "Illinois has a strong incentive to punish its citizens for . . . legal wrongs committed abroad, it was within the court's discretion to conclude that the U.K.'s stronger interest in protecting its citizens from the legal wrongs committed in England by foreign citizens makes England the more appropriate forum." *Id.*

21

Here, this Court should find that New Zealand's interests greatly outweigh those of the United States as the venue for this lawsuit. New Zealand has taken very similar steps to the United States in combatting human trafficking. This Court should not deny New Zealand the ability to establish its own precedent concerning claims and issues it regards as important and justiciable.

The factors at play on this *forum non conveniens* dismissal motion are neatly summarized in the Federal Civil Rules Handbook treatise (Federal Civil Rules Handbook (Reuters, 2025) § 2.17a, pp. 130 – 132), all of which favor dismissal of this Complaint, as follows:

### Public Interest Factors

- <u>Local Disputes</u>. Courts should "avoid imposing distant disputes on a local court." Considerations here are that the parties have minimal (Gaiman's vacation home) to no connections with the Western District of Wisconsin (i.e., Plaintiff is a New Zealand resident, Gaiman primarily resides out of state; and all alleged activity occurred in New Zealand where the events and alleged injury occurred).

- <u>Application of Foreign Law</u>. For all the supplemental jurisdiction claims, foreign law needs to be interpreted and followed.

- <u>Burdening Jurors with Cases of No Local Interest</u>. Local jurors should not have to carry the burden of trying a case unrelated to their community. Clearly, New Zealand citizens would have greater interest in the outcome.

- <u>Public Policy</u>. There is no U.S. public policy at issue in this suit.

- <u>Pending Litigation in Another Forum</u>. Plaintiff has filed several other federal lawsuits on the same claims; complained to authorities in New Zealand who declined to bring criminal charges; and it is clear she is forum shopping; and agreed to bring any disputes under her independent contractor agreement in New Zealand courts under New Zealand law.

22

**Private Interest Factors**

- Ease of Access to Evidence. Clearly and obviously the evidence is most easily accessed, if at all, in New Zealand.

- Cost of Witnesses To Attend Trial. Even if witnesses are willing to testify, they would have to travel over 8000 miles to attend this trial and spend a very large amount of time in the United States. If the counter is that depositions could be taken (and there is indication that is not available in New Zealand), the cost and expense of going there and taking trial depositions would be enormous.

- The Availability of Compulsory Process. There is no compulsory process available to bring a New Zealand witness to the United States to testify.

- Factors To Shorten, or Make Trial Less Expensive. Clearly that favors New Zealand, as the Plaintiff is a New Zealand citizen and Gaiman is a permanent resident there.

- Impact on Ability To Try/Defend Case. Bringing this foreign dispute to trial in the Western District of Wisconsin for the reasons stated, greatly prejudices Gaiman's ability to defend.

The Complaint must be dismissed on *forum non conveniens* grounds.

## II. PLAINTIFF'S STATUTORY CLAIMS MUST BE DISMISSED BECAUSE THE COMPLAINT FAILS TO STATE A CLAIM UNDER WHICH RELIEF CAN BE GRANTED.

Plaintiff uses the TVPA as a mechanism to bring several claims, mostly common law torts, in this Court rather than in New Zealand where the alleged wrongdoing supposedly occurred. The Complaint alleges four claims under the TVPA, 18 U.S.C. §§ 1589, 1590(a), 1591, and 1594, which she purports to bring under this Court's subject matter jurisdiction and five common law tort claims under supplemental jurisdiction. The TVPA claims, while based on a criminal statute, are referenced in both a civil remedies provision, § 1595, and an extraterritorial

23

jurisdiction provision, § 1596. Because the extraterritorial provision applies *only* to the substantive criminal provisions and ***not*** the civil remedies provision, this Court must apply the presumption against extraterritoriality and dismiss the TVPA claims under Rule 12(b)(6).

### A. Legal standard—presumption against extraterritoriality

The proper way to raise an extraterritorial defense is to bring a motion to dismiss for failure to state a claim under Rule 12(b)(6), rather than a subject-matter jurisdiction challenge under 12(b)(1). *Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 254, 130 S. Ct. 2869, 2877, 177 L. Ed. 2d 535 (2010) (holding that Rule 12(b)(6) was appropriate because the extraterritorial reach of a statute is a question of what the statute prohibits, not a court's power to hear a case). "The recognized standard for reviewing the grant of a motion to dismiss for failure to state a claim is whether it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Mescall v. Burrus*, 603 F.2d 1266, 1269 (7th Cir. 1979) (internal quotations omitted).

The presumption against extraterritoriality is a long-standing cannon of statutory interpretation which must be applied to §§ 1595 and 1596 of the TVPA. *See RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 336, 136 S. Ct. 2090, 195 L. Ed. 2d 476 (2016) (Courts "apply the presumption across the board, regardless of whether there is a risk of conflict between the American statute and foreign law.") (internal quotations omitted). The reasons behind the presumption against extraterritoriality include "avoiding international discord that can result when U.S. law is applied to

conduct in foreign countries" and the "commonsense notion that Congress generally legislates with domestic concerns in mind." *Id*. at 336.

The Supreme Court established a two-step framework for analyzing extraterritorial issues. *Id*. At step one, the question is "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *Id*. at 337. If the presumption has not been rebutted, then the second step is invoked. In the second step, a court must determine "whether the case involves a domestic application of the statute." *Id*. This is done by "looking at the statute's focus" and determining whether "the conduct relevant to the statute's focus occurred in the United States." *Id*. If so, "then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application." *Id*.

## B. The TVPA's language has resulted in conflicting decisions among federal district courts.

The TVPA was first enacted in 2000. Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464 (2000). In 2003, the first amendment to the TVPA added § 1595 which provided a civil remedy for any victim of an offense under Chapter 77. Section 1595 was amended several other times, lastly in 2023. In 2008, § 1596 was added which permits extra-territorial jurisdiction for specific ***offenses*** within the TVPA. The civil remedies section was not included in § 1596's list of specific offenses. The current iteration of the civil remedy statute contains no mention of extraterritoriality:

> (a) An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595. The TVPA's extraterritoriality statute specifically lists the statutes to which it should be applied, notably omitting the civil remedy provision:

> **(a) In General.—**In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any ***offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591*** if—
> **(1)** an alleged offender is a national of the United States or an alien lawfully admitted for permanent residence (as those terms are defined in section 101 of the Immigration and Nationality Act (8 U.S.C. 1101)); or
> **(2)** an alleged offender is present in the United States, irrespective of the nationality of the alleged offender.

*Id.* § 1596 (emphasis added)

The question of whether the TVPA's extra-territorial jurisdiction extends to civil suits under § 1595 has been decided by few courts and has resulted in conflicting decisions. The most illustrative precedent to date comes from two separate cases brought in the D.C. District Court which resulted in conflicting holdings. *See Doe I v. Apple Inc.*, No. 19-CV-03737 (CJN), 2021 WL 5774224, at *14 (D.D.C. Nov. 2, 2021), *aff'd sub nom. Doe 1 v. Apple Inc.,* 96 F.4th 403 (D.C. Cir. 2024) (holding that Congress did not authorize extra-territorial jurisdiction for civil remedies under § 1595); *but see United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2024 WL 4332117, at *13 (D.D.C. Sept. 27, 2024) (holding that § 1595 can apply extra-territorially).

In *Doe I*, the court held that § 1595—Civil remedy, does not apply extraterritorially. *Doe I,* 2021 WL 5774224 at *14. The court first established the long-standing presumption against extraterritoriality: "courts 'presume that a statute applies only domestically.'" *Id.* (citing *Nestlé USA, Inc. v. Doe*, 693 U.S. 628, 632, 141 S. Ct. 1931, 210 L. Ed 2d 207 (2021)). "This presumption can be rebutted only if the statute 'gives a clear, affirmative indication' that it covers foreign conduct." *Id.* (quoting *RJR Nabisco*, 579 U.S. at 337). "When a statute gives no clear indication of an extraterritorial application, it has none." *Id.* (citing *Morrison*, 561 U.S. at 255).

After establishing that the long-standing presumption against extra-territoriality can only be rebutted by a clear affirmative indication, the *Doe I* court turned to the language of the statutes at issue: Sections 1595 and 1596. "On its face, [§ 1595] says nothing about extraterritorial application. Thus, standing alone, it does nothing to rebut the presumption that it applies only domestically." *Id.* The extraterritoriality statute, § 1596, the court reasoned, only contained language that applied to criminal statutes, not the civil remedy. *Id.* at *15.

The *Doe I* court first addressed the fact that § 1596 explicitly grants extraterritorial jurisdiction to many criminal statutes, but did not include the civil remedy statute in that comprehensive list. *Id.* "Congress could have easily included § 1595 in § 1596, but it did not." *Id.* The court noted that "in the very same Act, Congress amended the text of § 1595 itself." *Id.* Second, the *Doe I* court reasoned that "the text and structure of § 1596 suggest that it was focused on criminal, not civil, applications." *Id.* For example, the "title of § 1596 is 'Additional jurisdiction in certain

trafficking **offenses**.'" *Id.* (quoting 18 U.S.C. § 1596) (emphasis added). The court then observed that the word "offense" is only used to refer to crimes in Title 18, not civil actions. *Id.* The Supreme Court also concluded that in Title 18, the term "offense" refers to criminal violations: "Although the term appears hundreds of times in Title 18, neither respondent nor the Solicitor General, appearing as an *amicus* in support of respondent, has been able to find a single provision of that title in which 'offense' is employed to denote a civil violation." *Kellogg Brown & Root Servs., Inc. v. United States ex rel. Carter*, 575 U.S. 650, 659, 135 S. Ct. 1970, 191 L. Ed. 2d 899 (2015). The *Doe I* court concluded that Congress's omission of § 1595 in the enumerated list of statutes affected by § 1596 "was an intentional decision not to extend extraterritorially the reach of the statute's civil component."[16] 2021 WL 5774224  at *16.

    In contrast, the *Hawkins* court found that § 1595 has extraterritorial reach. 2024 WL 4332117 at *13.  The court's reasoning, however, isn't compelling and does not establish a clear intention of Congress to overcome the presumption against extraterritorial jurisdiction. The *Hawkins* court justified its holding by reasoning: (1) that other provisions in the TVPA had an extra-territorial reach prior to the 2008 amendment; (2) that § 1595 is not an "offense," but a free-standing provision that creates a remedy for an offense; and (3) the predicate offenses have an extraterritorial

---

[16] The *Doe I* court explained that it "is not for this Court to question that decision; especially as grants of extraterritorial jurisdiction are fraught with international-relations considerations, ones far outside the judicial role." *Id.*

reach. *Id.* at \*11.  All of those arguments fail to overcome the presumption against extraterritoriality.

The *Hawkins* court asserted that because some specific provisions within the TVPA granted extraterritorial jurisdiction before the 2008 amendment that added § 1596, "it would be inappropriate to predicate a narrowing construction of the civil provision on a later, unrelated amendment to the statute." *Id.* This assertion is flawed because § 1596 is an expansion of the extraterritorial reach of the TVPA, not a narrowing. The *Hawkins* court likely misinterpreted this reasoning. *Doe I* did not state that § 1596 rescinded extraterritoriality for previously existing statutes, but rather that it ***extended*** extraterritoriality, limited to the enumerated statutes. Because the civil remedies statute, § 1595, did not contain a grant of extraterritoriality, the fact that it was not listed in § 1596 meant that this extension did not apply to civil remedies.

The *Hawkins* court's second rationale—the fact that § 1595 "is a free-standing provision that creates a civil remedy," *id.*, means that its omission in § 1596 does not preclude extra-territorial jurisdiction—is directly contradicted by long-standing Supreme Court precedent. The first step for analyzing extraterritoriality issues is "whether the presumption against extraterritoriality has been rebutted— that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially. We must ask this question regardless of whether the statute in question regulates conduct, ***affords relief***, or merely confers jurisdiction." *RJR Nabisco*, 579 U.S. at 337 (emphasis added). Because statutes that afford relief, as

§ 1595 does, must be evaluated independently, it is entirely relevant that it is omitted from the statute granting extraterritorial jurisdiction.

### C. The Fourth Circuit erred in its analysis of Supreme Court precedent – instead the Supreme Court's decision in *RJR Nabisco* compels that this Court apply the presumption against extraterritoriality and dismiss the Complaint.

The *Hawkins* court leaned heavily on the only appellate case to date that has rendered a decision on whether § 1596 applies to § 1595—*Roe v. Howard*, 917 F.3d 229, 244 (4th Cir. 2019). The *Roe* court found that § 1595 has extraterritorial reach through § 1596, but its holding was entirely based on a misapplication of the Supreme Court's precedent in *RJR Nabisco*. The *Roe* case was not about conduct within a foreign jurisdiction. In *Roe*, the plaintiff sued a State Department employee over conduct that occurred entirely on the grounds of the U.S. embassy in Sana'a, Yemen. The court established that special maritime and territorial jurisdiction of the United States encompasses the grounds of U.S. diplomatic installations—a stark contrast with the present case which alleges conduct solely within the jurisdiction of a foreign nation.

The error the *Roe* court makes, however, is in its interpretation of the Supreme Court's holding in *RJR Nabisco*. In *RJR Nabisco*, the Court was faced with two issues: (1) whether substantive provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO") contained in § 1962 apply to conduct that occurs in foreign countries; and (2) whether RICO's private right of action contained in § 1694(c) applies to injuries that are suffered in foreign countries. *RJR Nabisco*, 579 U.S. at 325. The *Roe* court erred in applying the substantive RICO analysis to the

30

TVPA's civil remedy statute. It should have applied the analysis the *RJR Nabisco* Court used to analyze RICO's ***civil remedy***. Because it did not, it is wrongly decided.

In *RJR Nabisco*, the Court held that the substantive definitions of racketeering activity within § 1962 were sufficiently predicated on statutes that expressly apply extraterritorially. *Id.* at 345. On the other hand, the Court held that § 1964(c), which provides a civil remedy for "violations of section 1962," does not allow recovery for foreign injuries." *Id.* at 353. The different treatment of the civil remedies provision is partly based on the Court's acknowledgment that "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct."[17] *Id.* at 346-47. The Court concluded that "there is a potential for international controversy that militates against recognizing ***foreign-injury claims*** without clear direction from Congress." *Id.* at 348 (emphasis added).

Having differentiated between the substantive RICO statute and the civil remedies provision, the Court goes on to find that "nothing in § 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside the United States." *Id.* at 350. Even though § 1964(c) states that any "person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . in any appropriate United States district court," it did not provide a clear indication that Congress intended to create a private right of action

---

[17] The *Roe* Court also cites prior cases in which foreign countries advised the Court that applying U.S. "remedies would unjustifiably permit their citizens to bypass their own less generous remedial schemes, thereby upsetting a balance of competing considerations that their own domestic . . . laws embody." *Id.* at 347 (internal quotations omitted).

for ***injuries*** suffered outside the United States. The Court reached this conclusion despite that it held § 1962 had extraterritorial reach in the same opinion. *Id.* at 345. The Court reasoned that the concept of a foreign injury is distinct from the concept of violating a criminal statute. The same distinction must be made in the present case. As the Court said in *RJR Nabisco*: "It is not enough to say that a private right of action must reach abroad because the underlying law governs conduct in foreign countries." *Id.* at 350.

The civil remedies statute in the present case reads nearly the same as the civil remedy statute confronted by the *RJR Nabisco* Court. TVPA § 1595 states:

> **(a)** An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

18 U.S.C. § 1595. RICO's § 1964(c) states:

> **(c)** Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

*Id.* § 1964. Importantly, both statutes address violations of substantive laws. The TVPA civil remedy statute addresses all violations within the chapter, some of which either grant extraterritorial jurisdiction through provisions within the statute or by reference from § 1596. RICO's civil remedies statute addresses § 1962, which itself references statutes granting extraterritorial jurisdiction.

*RJR Nabisco* differentiated between the criminal statute applying extraterritorially and the civil remedy applying extraterritorially because the civil remedy invokes an injury rather than just the violation of the underlying crime. *RJR Nabisco*, 579 U.S. at 328. This same reasoning must be applied here, as the Plaintiff's claims are not just based on foreign conduct but based on foreign injuries as well.

Although § 1595 does not explicitly mention injuries, it does state that a plaintiff "may recover damages." The term "damages" necessitates an injury. *See* DAMAGES, Black's Law Dictionary (12th ed. 2024) ("**damages** *n. pl.* (16c) Money claimed by, or ordered to be paid to, a person as compensation for loss or injury"). A civil remedy where the relief is "damages" requires an injury. Because § 1595 requires an injury, this Court must reject the holding in *Roe and* follow the *RJR Nabisco* precedent and hold that the presumption against extraterritoriality has not been rebutted.

The second step in this analysis is whether the case involves a domestic application of the statute. This question can be answered succinctly. It does not. The Complaint only alleges foreign conduct and foreign injuries. *See* Compl. ¶¶ 7, 258-312, 313-64. Under no interpretation of the Complaint, no matter how favorable to the Plaintiff, can it be found to involve a domestic application of the TVPA. As such, the statutory claims must be dismissed under Rule 12(b)(6) for failure to state a claim.

## III.  THE DOCTRINE OF PRUDENTIAL EXHAUSTION REQUIRES PLAINTIFF TO EXHAUST REMEDIES AVAILABLE IN NEW ZEALAND.

If this Court does not dismiss this case based on *forum non conveniens*, or the presumption against extraterritoriality, it must require the Plaintiff to exhaust

her local remedies prior to suing in the United States. The Seventh Circuit has adopted the prudential exhaustion doctrine for transnational litigation, which would require the Plaintiff to exhaust all remedies in New Zealand prior to bringing her claims anywhere in the United States.

Prudential exhaustion, also referred to as the "local remedies rule," originated in the context of international law. "Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national interest until that person has exhausted domestic remedies." Restatement (Third) of the Foreign Relations Law of the United States § 713 cmt. f (Am. L. Inst. 1987). The rule evolved to prevent suits by foreign plaintiffs concerning foreign conduct brought in U.S. courts. In *Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739, 159 L. Ed. 2d 718 (2004), Justice Souter stated that the Court "would certainly consider . . . in an appropriate case" requiring that "the claimant [exhaust] any remedies available in the domestic legal system."[18] *Id.* at 733 n.21.

The Ninth Circuit first recognized the prudential exhaustion rule in the context of the Alien Tort Statute ("ATS"). *Sarei v. Rio Tinto, PLC*, 550 F.3d 822 (9th Cir. 2008) (plurality). In explaining her rationale of applying a rule in used international tribunals domestically, Judge McKeown wrote:

---

[18] *Sosa*'s opinion was not based on the prudential exhaustion rule, but rather that the Alien Tort Statute did not grant a cause of action.

> Though it is self-evident, it is worth remembering that in ATS adjudication, the United States courts are *not* international tribunals. With this in mind, the appropriateness of applying prudential exhaustion to some ATS cases only gains force; if exhaustion is considered essential to the smooth operation of international tribunals whose jurisdiction is established only through explicit consent from other sovereigns, then it is all the more significant in the absence of such explicit consent to jurisdiction.

*Id.* at 830.

Although Judge McKeown's rationale remained limited to the Ninth Circuit for ATS cases—likely because the ATS's extraterritoriality was restrained via other doctrines[19]—it found footing in other transnational litigation.

Most relevant to this litigation is the Seventh Circuit's adoption of the prudential exhaustion rule in *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 679 (7th Cir. 2012), *aff'd sub nom. Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015). In both *Abelesz* and *Fischer*, plaintiffs were Hungarian citizens and Holocaust survivors. *Fischer*, 777 F.3d at 852; *Abelesz*, 692 F.3d at 665. The suits were brought under the Foreign Sovereign Immunities Act ("FISA") against the Hungarian national bank and national railway for taking the property of Hungarian Holocaust victims. *Fischer,* 777 F.3d at 857.

The *Abelesz* court noted that FISA contained no statutory language suggesting "that plaintiffs must exhaust domestic Hungarian remedies before bringing suit in the United States." *Abelesz*, 692 F.3d at 678. Despite this lack of statutory language, the court dismissed the cases based on a failure to exhaust domestic remedies. The court explained that the prudential exhaustion "rule is based

---

[19] *See* Beal, Sara Sun. *The Trafficking Victim Protection Act: The Best Hope for International Human Rights Litigation in the U.S. Courts*, 50 Case W. Res. J. Int'l L. 17, 2 (2018) (In "the past two decades the [ATS's] reach has been substantially narrowed by judicial decisions.").

on the idea that the state where the alleged violation occurred should have an opportunity to redress it by its own means, within the framework of its own legal system." *Id.* at 680 (citing *Interhandel (Switz v. United States)*, Preliminary Objections, 1959 I.C.J. 6, 26–27 (Mar. 21).[20] Only if there "is a legally compelling reason for plaintiff's failure to exhaust" domestic remedies, will the "domestic exhaustion rule not bar their claims." *Abelesz,* 692 F.3d at 682.

*Abelesz* and *Fischer* applies equally to the TVPA. The Seventh Circuit did not base its decision on the language of the underlying statute. Instead, the court based its decision on a much broader principle that also applies to the present case: "We found that the comity at the heart of international law required plaintiffs either to exhaust domestic remedies in Hungary or to show a powerful reason to excuse the requirement." *Fischer,* 777 F.3d at 858. Because the Seventh Circuit based its decision on a broad comity principle rather than on statutory interpretation, its precedent must be upheld the same as in the *Fischer* and *Abelesz* cases.

In the present case, the Plaintiff has not even pleaded—let alone demonstrated—that she pursued and exhausted domestic remedies in New Zealand, nor has she offered any reason or explanation for why she has not done so. Because the alleged conduct occurred entirely within the jurisdiction of New Zealand, and because New Zealand has a well-functioning legal system with available remedies for

---

[20] In *Interhandle*, the Swiss court upheld the objection of the United States that the court had no jurisdiction to hear the matter because plaintiff had not exhausted the local remedies available to it in U.S. courts.

all of the Plaintiff's claims,[21] (and in this case the Plaintiff is a New Zealand citizen and Gaiman is a New Zealand permanent resident) this Court should decline jurisdiction until after Plaintiff has exhausted her pursuit of remedies under New Zealand law.

## IV.    INTERNATIONAL COMITY STRONGLY MILITATES FOR ABSTENTION

While *forum non conveniens*, prudential exhaustion, and the presumption against extraterritoriality arise from principles of comity, international comity is a broader concept that incorporates considerations outside the scope of these more narrowly tailored comity-based doctrines.[22] International comity permits this Court discretion to dismiss this case based on the comity principle of restraint.

International comity can best be defined as "deference to foreign government actors that is not required by international law but is incorporated in domestic law." Dodge, *International Comity in American Law*, 115 Colum. L. Rev. at 2078. As a broad doctrine, comity can come in many forms: deference to foreign lawmakers, deference to foreign tribunals, and deference to foreign governments as litigants. *Id*. Relevant to this case is the international comity principle of restraint "as a means of restraining the reach of American law, [and] the jurisdiction of American courts." *Id*. Justice Scalia used the phrase "prescriptive comity" to refer to "the respect sovereign nations afford each other by limiting the reach of their laws."

---

[21] Supra p. 19-23

[22] *See* William S. Dodge, *International Comity in American Law*, 115 Colum. L. Rev. 2071, 2071 (2015) ("The doctrines of American law that mediate the relationship between the U.S. legal system and those of other nations are nearly all manifestations of international comity.").

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 817, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993) (Scalia, J., dissenting).

Justice Holmes's early explanation of why a court must sometimes abstain on international comity grounds is a rationale relevant to the present case: A nation treating a defendant "according to its own notions rather than those of the place where he did the acts, not only would be unjust, but would be an interference with the authority of another sovereign, contrary to the comity of nations, which the other state concerned justly might resent." *Am. Banana Co. v. United Fruit Co.*, 213 U.S. 347, 356, 29 S. Ct. 511, 512, 53 L. Ed. 826 (1909). Based on this long-standing principle, courts must exercise caution when adjudicating acts committed within the jurisdiction of a foreign nation. This court must do so here. The principle of international comity is another reason for this Court to dismiss this Complaint so that she can bring her claims in the proper forum -- New Zealand.

## V. THE COMMON LAW CLAIMS BROUGHT UNDER § 1367, SUPPLEMENTAL JURISDICTION, MUST ALSO BE DISMISSED.

Plaintiff brought claims against Gaiman for assault, battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. These claims are common law claims invoking the supplemental jurisdiction of this Court. 28 U.S.C. § 1367; Compl. ¶¶ 7, 313-64. If this Court dismisses the underlying statutory claims for any reason, the supplemental claims must be dismissed under § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."). "The general rule is that when as here the federal

claim drops out before trial . . . the federal district court should relinquish jurisdiction over the supplemental claim." *Van Harken v. City of Chi.*, 103 F.3d 1346, 1354 (7th Cir. 1997); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999) (It "is the well-established law of this circuit that the usual practice is to dismiss without prejudice . . . supplemental claims whenever all federal claims have been dismissed prior to trial."). This presumption in favor of dismissing the supplemental claims when the federal claim is dismissed before trial is especially strong in cases where there has been little or no discovery. *Van Harken* at 1354. Although this presumption is rebuttable, the fact that the supplemental claims in this case arise from the common law of a foreign nation, the presumption cannot be rebutted. New Zealand tort claims  should be heard in New Zealand.

## CONCLUSION

Defendant Neil Gaiman respectfully demands that the Court dismiss the Complaint against him on the merits and with prejudice, award him attorney's fees and expenses incurred in defending this action and grant him such other and further relief as the Court deems just and proper.

KRAVIT, HOVEL & KRAWCZYK S.C.


*s/Stephen E. Kravit*
Stephen E. Kravit
State Bar No. 1016306
Brian T. Fahl
State Bar No. 1043244
Wesley E. Haslam
State Bar No. 1121993
Andrea N. Panozzo
State Bar No1122016

Kravit, Hovel & Krawczyk s.c.
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202
(414) 271-7100 (phone)
(414) 271-8135 (facsimile)
kravit@kravitlaw.com
btf@kravitlaw.com
weh@kravitlaw.com
anp@kravitlaw.com

-and-

BERK BRETTLER LLP


*s/Andrew B. Brettler*
Andrew B. Brettler
Pro hac vice (admission applied for)
Jake A. Camara
Pro hac vice (admission applied for)
Berk Brettler LLP
9119 West Sunset Boulevard
West Hollywood, California 90069
(310) 278-2111
abrettler@berkbrettler.com
jcamara@berkbrettler.com

*Attorneys for Defendant Neil Gaiman*

Dated:  March 4, 2025