# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

SCARLETT PAVLOVICH,

                    Plaintiff,

     v.

NEIL GAIMAN and AMANDA PALMER,

                 Defendants.

Case No.: 3:25-CV-00078-JDP

**PLAINTIFF SCARLETT PAVLOVICH'S RESPONSE TO DEFENDANT NEIL GAIMAN'S MOTION TO DISMISS**

---

## PLAINTIFF SCARLETT PAVLOVICH'S RESPONSE TO DEFENDANT NEIL GAIMAN'S MOTION TO DISMISS

---

*/s/ Michael Nimmo*
Michael Nimmo (Pro Hac Vice)
**WAHLBERG, WOODRUFF, NIMMO & SLOANE, LLP**
4601 DTC Blvd., Suite 950
Denver, CO 80237
Phone: 303-571-5302
Michael@denvertriallawyers.com

Lane A. Haygood (Pro Hac Vice)
Dylan Schmeyer (Pro Hac Vice)
Thomas Neville (Pro Hac Vice)
Akiva M. Cohen (Pro Hac Vice)
**KAMERMAN UNCYK SONIKER & KLEIN, P.C.**
1700 Broadway
New York, NY 10019
Phone: 212-400-4930
lhaygood@kusklaw.com
dschmeyer@kusklaw.com
tneville@kusklaw.com
acohen@kusklaw.com
*Attorneys for Plaintiff*

# Table of Contents

Introduction ................................................................................................................................5

BACKGROUND ........................................................................................................................9

ARGUMENT ...........................................................................................................................11

    I.    The Western District of Wisconsin is the Proper Forum and Defendant Gaiman's *Forum Non Conveniens* Motion Must Be Denied ................................................................................11

        A.    New Zealand's Forum is Not an Available or Adequate Forum ..........................13

        B.    Scarlett's Choice of Forum is Entitled to Deference ................................................17

        C.    New Zealand is Not a More Convenient Forum ....................................................18

            1.    The Private Interests Favor Litigation in Wisconsin .................................19

            2.    The Public Interest Factors Strongly Favor Litigation in This District ............25

            3.    The Interests of Justice Favor the Western District of Wisconsin.....................28

            4.    Scarlett Did Not Contract to Sue in New Zealand .....................................29

    II.    This Court Has Jurisdiction over Scarlett's TVPA Claims and Gaiman's 12(B)(6) Motion Must Be Denied.....................................................................................................................30

    III.    Defendant's Remaining Arguments Fail ................................................................35

        A.    Prudential Exhaustion Does Not Apply to Scarlett's Claims ..............................36

        B.    Application of Comity Does Not Result in Dismissal of Scarlett's Claims .........................36

        C.    This Court Should Maintain Jurisdiction Over Scarlett's State Law Claims.......................37

    CONCLUSION........................................................................................................................37

# Table of Authorities

## Cases

*Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012) ...............................................36

*Abernathy v. Carlyle Grp., Inc.*, 2024 WL 5331993 (D.D.C. Sept. 27, 2024)........................... 33, 35

*Adhikari v. KBR Inc.*, 2017 WL 4237923 (S.D. Tex. Sept. 25, 2017) .......................................32

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..............................................................30

*Coffey v. Van Dorn Iron Works*, 796 F.2d 217 (7th Cir.1986) ................................................28

*Deb v. SIRVA, Inc.*, 832 F.3d 800 (7th Cir. 2016)...............................................12, 13, 17

*Doe I v. Apple Inc.*, 2021 WL 5774224 (D.D.C. Nov. 2, 2021) .................................8, 33, 34

*Domanus v. Lewicki*, 645 F. Supp. 2d 697 (N.D. Ill. 2009)......................................................15

*Duha v. Agrium, Inc.*, 448 F.3d 867 (6th Cir.2006).................................................................23

*Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015) .......................................36

*Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268 (S.D. Fla. 2020) ................................25

*Ganpat v. E. Pac. Shipping, PTE. LTD*, 581 F. Supp. 3d 773 (E.D. La. 2022) ......................25

*Gulf Oil Corp. v Gilbert*, 330 U.S. 501 (1947) ........................................................................6

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ......................................................................19

*In Re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147 (5th Cir. 1987) ....................12

*In re Bridgestone/Firestone, Inc.*, 420 F.3d 702 (7th Cir. 2005). ...........................................11

*In re Consolidated Industries*, 360 F.3d 712 (7th Cir. 2004).................................................24

In re Factor VIII or IX Concentrate Blood Products Litig., 484 F.3d 951 (7th Cir. 2007)................13

*Instituto Mexicano del Seguro Soc. v. Zimmer Biomet Holdings, Inc.*, 29 F.4th 351 (7th Cir. 2022) ...............18

Kamel v. Hill–Rom Co., 108 F.3d 799 (7th Cir. 1997) ...........................................................12

*Lacey v. Cessna Aircraft Co.*, 862 F.2d 38 (3d Cir. 1988) .....................................................19

*Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001) ....................................................16

*Lynn v. Becton Dickinson & Co.*, 2022 WL 610819 (S.D. Ohio Mar. 2, 2022) ..........................25

*Norex Petroleum, Ltd. v. Access Industries, Inc.*, 416 F.3d 146 (2d Cir. 2005) .......................15

Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981) ....................................................................13

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003)....................26

*PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65 (2d Cir. 1998) .................15

*Ramirez de Arellano v. Starwood Hotels & Resorts Worldwide, Inc.*, 448 F. Supp. 2d 520 (S.D.N.Y. 2006) .................................................................................... 18, 25

*Ratha v. Rubicon Res., LLC*, 111 F.4th 946 (9th Cir. 2024)....................................................32

*Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559 (Fed.Cir.1997) ..............................28

*RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016) ................................................. 31, 35

*Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019) ...................................................passim

*Salebuild, Inc. v. Flexisales, Inc.*, 633 F. App'x 641 (9th Cir. 2015) ..............................25

*Sarei v. Rio Tinto, PLC*, 550 F.3d 822 (9th Cir. 2008) ...........................................36

*Sector Nav. Co. v. M/V CAPTAIN P*, No. CIV A 06-1788, 2006 WL 2946356
   (E.D. La. Oct. 13, 2006) ...........................................................................17

Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422 (2007) ..................12

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) .................................................36

*U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162 (D. Md. 2019).................. 32, 33

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, 2024 WL 4332117 (D.D.C. Sept. 27, 2024)............33

*Wisconsin Freeze Dried LLC. v. Redline Chambers, Inc.*, 375 F.Supp.3d 1038 (E.D. WISC), ..................29

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000) ................................15

## Statutes

18 U.S.C. § 1367 ...................................................................................37

18 U.S.C. § 1595 ............................................................................... 33, 35

18 U.S.C. § 1596 ...................................................................................33

## Other Authorities

Companies Act of 2006, c. 46 (U.K.) ..............................................................19

Dougherty, Validity of Contractual Provision Limiting Place or Court in Which Action May Be
   Brought, 31 A.L.R.4th 404 § 3 (1984) ..........................................................30

Limited Liability Partnerships (Application of Companies Act 2006) Regulations, No. 1804 (U.K.) 19

Regulation 31D ....................................................................................19

Regulation 31E ....................................................................................19

Regulation 31JA ...................................................................................20

The Limited Liability Partnerships (Application of Companies Act 2006) Regulations 2009, 2009
   No. 1804 (UK) .................................................................................19

Plaintiff, SCARLETT PAVLOVICH, by and through her undersigned attorneys, and in support thereof states as follows:

## INTRODUCTION

Defendant Gaiman argues that Plaintiff's claims are a sham but even so, the correct forum for her claims is in New Zealand because the events took place in New Zealand between a New Zealand citizen and a New Zealand permanent resident. Ironically, it is Gaiman's arguments that should be considered a sham as they are not supported by the facts or New Zealand law. While Gaiman describes himself as having a "permanent residency" visa, Gaiman is not a citizen of New Zealand nor a "resident". Gaiman is a foreign national in New Zealand who has a visa that allows him to enter New Zealand and work under that visa. Expert Declaration of Jack Wass ("Wass Dec."), Ex. A. at ¶ 5.3. "Neil Gaiman ["Gaiman"] was born in Hampshire, UK, *and now lives in the United States near Minneapolis*." That is the opening line of Neil Gaiman's biography at his NeilGaiman.com webpage,[1] Declaration of Dylan Schmeyer ("Schmeyer Dec.") Ex. 1, the personal site he operates and to which he posted his January 14, 2025, journal entry publicly responding to the multiple women who accused him of sexual abuse and assault.[2] Schmeyer Dec. Ex. 2. Further, Defendant Gaiman recently filed documents with Companies House, the UK government's equivalent to the secretary of state's business entities database, confirming to the UK government that his primary residency is in the United States. Schmeyer Dec. Ex. 3. Based on these filings, Defendant Gaiman has been and remains a resident of the United States since May of 2024.

Yet Gaiman, who was sued in his home district and subject to the jurisdiction of the Court, now asks the Court to move this litigation to New Zealand, for his supposed convenience. However, New Zealand law bars a plaintiff from bringing a civil claim against a defendant for compensatory

---

[1] Available at https://web.archive.org/web/2/https://www.neilgaiman.com/About_Neil/Biography (emphasis added).

[2] Available at https://web.archive.org/web/20250325222145/https://journal.neilgaiman.com/.

personal injury damages. Wass Dec. Ex. A, ¶ 1.3(a).  As shown herein, Gaiman's motion is transparently strategic, seeking to avoid application of the U.S. laws that would hold him responsible for his conduct and subject him to meaningful civil liability in hopes of convincing this Court to have his claim brought in New Zealand where he could not be subject to a lawsuit and cannot be held legally liable for the damages he caused. Because Gaiman utterly fails to carry the "heavy burden"[3] of such a request, Plaintiff Scarlett Pavlovich ("Scarlett") respectfully submits this memorandum of law in opposition to that motion.

This action arises out of Gaiman's sexual abuse and repeated sexual abuse of Scarlett, but while the litigation as a whole will focus on that abuse, Gaiman's motion is more limited: it seeks to dismiss Scarlett's claims based on *forum non conveniens*, and arguments that the Trafficking Victim Protection Act ("TVPA") does not allow a private right of action for damage suffered internationally, failure to exhaust remedies in New Zealand, and the theory of "Comity." None of these arguments have merit.

Gaiman's *forum non conveniens* motion fails. Gaiman presents his motion with his story-teller's sleight of hand,[4] implying-without-affirmatively-saying that he is currently living in New Zealand. *See* Doc. No. 22, ¶ 4 (describing Gaiman as "ha[ving] permanent residency" in New Zealand); Doc. No. 22, ¶ 4 (attesting to his "permanent resident" status in New Zealand and describing himself as having lived there several years ago). But Gaiman does not live in New Zealand nor is he a citizen of New Zealand. He is a U.S. permanent resident. Doc. No. 22, ¶ 3 (Gaiman attesting as much) and admits on his website to **currently** residing "near Minneapolis," owns his property in Menomonie, and helpfully explains to his fans that his postings to his NeilGaiman.com website are typically done

---

[3] *Gulf Oil Corp. v Gilbert*, 330 U.S. 501, 504 (1947).

[4] "They do it with mirrors. … Mirrors are wonderful things. They appear to tell the truth, to reflect life back out at us; but set a mirror correctly and it will lie so convincingly you'll believe that something has vanished into thin air … Stories are, in one way or another, mirrors …" Gaiman, N., <u>An Introduction</u>, in *Smoke and Mirrors: Short Fictions and Illusions*, pp 1-2 (Avon Books, 1998).

from the Central Time Zone. *See* NeilGaiman.com, *FAQs: On Gaiman* ("**Do you post at really strange hours?** Yup, the time on the blogger is always in Pacific Time, wherever I am. So, if it says I'm posting at 1.07am [sic], I probably posted it at 3.07am [sic]").[5]

This fact does not stand alone. Wisconsin is a vastly more convenient forum for Scarlett than New Zealand. This District is literally three times closer to Scarlett's current home, in Scotland (where she is in university) than New Zealand.[6] While the key witnesses – Scarlett, Gaiman, and Palmer – are each subject to process and discovery in this District, Palmer is also no longer living in New Zealand.[7] Pavlovich Dec. ¶ 2. As to the array of ancillary "witnesses" Gaiman claims to need in New Zealand, not only are they far less central to the claims than the parties here, but he acknowledges that there is no guarantee that they would be amenable to compulsory process even if the litigation had been filed in New Zealand, rendering New Zealand no more convenient a place to obtain their testimony.

Substantively, Gaiman acknowledges that Scarlett's Complaint adequately pleads that he committed a crime under the TVPA but contends that the Trafficking Victim Protection Act's ("TVPA") private right of action was not intended to protect trafficking victims trafficked outside of the United States. But the TVPA is **expressly** extraterritorial – Section 1596 specifies that the courts of the United States have extra-territorial jurisdiction over offenses set forth in the TVPA, while Section 1595 creates a private right of action for such violations. For that reason, nearly every court,

---

[5] https://www.neilgaiman.com/FAQs/On_Gaiman#q9; archive at
https://web.archive.org/web/2/https://www.neilgaiman.com/FAQs/On_Gaiman#q9

[6] Madison, Wisconsin is 3,704 miles from Edinburgh, Scotland. New Zealand is 11,386 miles away. *Compare* https://tinyurl.com/bdh9ddmc (Google results for the search "how many miles from Madison, WI to Edinburgh, Scotland") *with* https://tinyurl.com/yjr6kauu (Google results for the search "How many miles from Edinburgh, Scotland to New Zealand").

[7] Scarlett sued Palmer here, in the District of Massachusetts, and the Southern District of New York to ensure that she could obtain personal jurisdiction over Palmer before the expiration of any three-year statutes of limitations. Palmer has appeared in Massachusetts and her counsel has conveyed that she intends to litigate the claims there. Schmeyer Dec. ¶ 4 and Ex. 3**.** Accordingly, Scarlett will be voluntarily dismissing the claims against Palmer in this action (and the New York action) and Palmer will be a third-party witness in Scarlett's suit against Gaiman.

including the only appellate court to consider the issue, has found that the TVPA's civil remedy applies extraterritorially, with only a single district judge finding otherwise.[8] As shown below, this Court should join with the majority in concluding that – as the plain text of Section 1595 recites – the TVPA creates a private right of action for **any** violation of its provisions, which this Court has extra-territorial jurisdiction to hear.

Most fundamentally, however, New Zealand is not an adequate or available alternative forum to begin with. New Zealand has no analogous civil private right of action for trafficking victims and bars any personal injury civil claim for damages. Indeed, the sources **Gaiman** cites make that clear, pointing to a New Zealand **small claims court's** award of $6,000 to a trafficking victim not on a trafficking tort, but **on the basis that she had been defrauded into paying that amount to her traffickers,** as the sole civil action relating to trafficking since New Zealand passed its anti-trafficking law.

The doctrine of comity also does not lead to a finding that New Zealand is the proper forum. Scarlett can't exhaust her remedies in New Zealand because New Zealand bars any civil tort claim for compensatory damages and New Zealand does not have a civil cause of action under New Zealand's equivalent TVPA. Defendant Gaiman lives in the United States and Scarlett lives in Scotland. As such, there is no reason this Court should give deference to New Zealand courts as there is no New Zealand law available to Scarlett and the dispute is between a Plaintiff and Defendant who do not reside in New Zealand.

---

[8] Gaiman's brief misleadingly presents *Doe I v. Apple Inc.*, No. 1:19-CV-03737 (CJN), 2021 WL 5774224 (D.D.C. Nov. 2, 2021) as affirmed by the D.C. Circuit, when it should have been identified as "affirmed on other grounds in part, reversed on other grounds in part." On appeal, the D.C. Circuit reversed the district court's conclusion that the *Doe* plaintiff lacked standing, affirmed that the plaintiff had failed to sufficiently allege the elements of a TVPA offense, and never reached the district court's extraterritoriality ruling, which was the district court's *third* alternative ground for dismissing the case. *See* 2021 WL 5774224 at *14-16.

Finally, Plaintiff's state law tort claims are properly pleaded, and the Court has subject matter jurisdiction over those claims. Even if the Court has supplemental jurisdiction over the state law tort claims, the Court has discretion to continue to exercise that jurisdiction even if the federal claims were dismissed and should do so as the claims have been properly pled against a current resident of Wisconsin.

## **BACKGROUND**

Scarlett Pavlovich is merely the latest of Neil Gaiman's victims; Gaiman has a decades-long history of sexual misconduct. Doc. No. 2, ¶ 11. Scarlett met Defendant Gaiman's after befriending his wife, Amanda Palmer, in New Zealand. *Id.*, ¶¶ 20, 46. Scarlett was 22 years old, poor, without secure housing or a stable means of income, and in fragile mental health. *Id.*, ¶¶ 22, 30-35. Gaiman and his wife were celebrities with multiple homes on New Zealand's Waiheke Island. *Id.*, ¶ 39,40. Palmer was well aware of Scarlett's vulnerabilities, and informed Gaiman that Scarlett was vulnerable before introducing him to her. *Id.*, ¶¶ 36-37,92-94. After befriending Scarlett, Palmer would have Scarlett do her unpaid personal favors such as running errands, babysitting, or helping Palmer around the house. *Id.*, ¶ 28.

On February 1, 2022, Palmer asked Scarlett to babysit for both her and Gaiman for the weekend, watching their mutual child at their separate homes. Doc. No. 2, ¶¶ 38-39. Palmer promised that this time, Scarlett would be paid for her work, and Scarlett agreed. *Id.*, ¶ 44. Scarlett arrived at Gaiman's house on the afternoon of February 4, 2022, spent an hour playing with Gaiman's child before Gaiman dropped the child at a friend's house, and then once he was alone with Scarlett, he sexually assaulted her. *Id.*, ¶¶ 46-49, 51-84.

To accomplish his sexual assault, Gaiman first lured Scarlett into bathing in his garden bathtub, falsely reassuring her that he would be otherwise occupied. Doc. No. 2, ¶¶ 51-59. Once she was in the tub, Gaiman disrobed and got into the tub with her, without Scarlett's invitation or

consent, shocking and frightening her. *Id.*, ¶¶ 60-64. She communicated that shock and fright in obvious physical ways, curling into herself and hiding her body. Doc. No. 2, ¶ 67. Gaiman instructed her to stretch out, refusing to take "no" for an answer, and when Scarlett reluctantly complied, he began to touch her, eventually escalating to penetrating her rectum with his fingers, attempting to penetrate her rectum with his penis, and ejaculating onto her face despite Scarlett specifically telling him not to do so. *Id.*, ¶¶ 68-84.

After that first sexual assault, Gaiman instructed Scarlett to call him "Master," called her a "good little girl," and watched Scarlett attempt to clean herself off. Doc. No. 2, ¶¶ 85-88. And Gaiman explained that Palmer had told him he could not "have Scarlett," and that hearing that warning only fueled his desire. *Id.*, ¶¶ 89-93. Gaiman and Palmer then continued to use and abuse Scarlett for weeks, while failing to pay her for her work babysitting their son, then offering her a job as a live-in nanny – a job Scarlett took because of her desperately insecure economic position; however, they neglected to pay her for her work once they had her completely dependent on them financially and for housing. Doc.  No. 2, ¶¶ 112-126. Scarlett remained dependent and trapped, and Gaiman proceeded to repeatedly sexually assaulted Scarlett in increasingly horrific ways, despite her multiple (and often screamed) protests. *Id.*, ¶¶ 127-182. Gaiman's conduct and mistreatment of Scarlett was so pervasive that his young son, aping his father, began to call Scarlett "slave." *Id.*, ¶ 189.

During the time period Defendant Gaiman sexually abused Scarlett, between February 4, 2022, and February 25, 2022, Scarlett was not paid for her work as a nanny and for other household services she provided despite being hired by Defendant Gaiman and Defendant Palmer to provide said services.  Scarlett fulfilled her required work obligations for several weeks, but Defendants failed to pay her for any of those services, which occurred during the time she was being sexually abused.  Declaration of Scarlett Pavlovich ("Pavlovich Dec.") ¶ 11.

Not until February 26, 2022, when Defendant Gaiman left New Zealand, and traveled to Scotland, did the sexual abuse stop.  But as of February 26, 2022, after enduring weeks of sexual abuse and preforming nanny services, Scarlett had received no compensation for the services she had completed. *Id.* ¶ 12.

On March 24, 2022, Defendant Gaiman sent a text to Scarlett stating that Defendant Palmer told him two weeks earlier that Scarlett had reported to her that Defendant Gaiman had sexually assaulted Scarlett and Defendant Gaiman texted Scarlett he wanted to kill himself.  Doc. No. 23-1 at 14.

Eventually on March 25, 2022, Scarlett received payment for her nanny services, but it was only after the sexual abuse had stopped and after Defendant Gaiman had left the country. Pavlovich Dec. ¶ 14.

## ARGUMENT

### I.  The Western District of Wisconsin is the Proper Forum and Defendant Gaiman's *Forum Non Conveniens* Motion Must Be Denied

Gaiman's motion to dismiss based on *forum non conveniens* is meritless, because New Zealand does not provide an available alternative forum for Scarlett to bring a civil claim for damages against Defendant Gaiman.  Wass Dec. Ex. A, ¶ 1.3(a). Even if there were an available forum in New Zealand, litigating Scarlett's claims would be far less convenient for the parties than the Western District of Wisconsin, where Gaiman resides.  Further, the U.S. has an articulated strong policy interest in seeing this suit proceed in U.S. district courts.  Notwithstanding any of the above reasons, the interests of justice would compel retention of jurisdiction. The motion should be denied.

The doctrine of *forum non conveniens* allows – but does not require – a district court to dismiss an action in service of both the convenience of the parties and the interests of justice. *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 703 (7th Cir. 2005). Dismissal based on *forum non conveniens* is "a drastic exercise of the court's inherent power" that must be reserved for exceptional cases. *Deb v.*

*SIRVA, Inc.*, 832 F.3d 800, 805–06 (7th Cir. 2016) (vacating a *forum non conveniens* dismissal of claims by Canadian plaintiff regarding contract with Indian moving company for move of belongings from India to Canada), *quoting Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011). "Unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v Gilbert*, 330 U.S. 501, 504 (1947).  A defendant moving for *forum non conveniens* dismissal therefore bears a heavy burden, and plaintiff's choice of forum should not be disturbed unless it is "oppressive and vexatious to the defendant, out of all proportion to the plaintiff's convenience." *Id.*, *quoting In re Ford Motor Co., Bridgestone/Firestone N. Am. Tire, LLC*, 344 F.3d 648, 651 (7th Cir. 2003).

To determine whether a dismissal for *forum non conveniens* is appropriate, a court first must determine if an alternative and adequate forum is available and then go on to balance the interests of the various participants. *Deb*, 832 F.3d at 807. Defendants must submit evidence of an adequate and alternative forum. *Id* at 810. The defendants' burden in alleging *forum non conveniens*, however, is heavy in opposing Plaintiff's chosen forum. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. at 422, 430 (2007).

The first step in any *forum non conveniens* inquiry is to decide whether an adequate alternative forum is available and exists.  *Kamel v. Hill–Rom Co.*, 108 F.3d 799, 802 (7th Cir. 1997) (citing *Piper Aircraft*, 454 U.S. at 254 n.22). The availability of the forum is a two-part inquiry involving availability and adequacy. *In Re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1165 (5th Cir. 1987) "An alternative forum is available if all parties are amenable to process and are within the forum's jurisdiction. Here, neither party is in the alternative forum's jurisdiction (New Zealand), as both parties reside out of the country, Scarlett in Scotland, and Defendant Gaiman in the United States.

An alternative forum is adequate when the parties will not be deprived of all remedies or treated unfairly." *In re Factor VIII or IX Concentrate Blood Products Litig.*, 484 F.3d at 957.*citing Kamel*, 108 F.3d at 803). Adequacy only comes into play to the extent that the remedy would be so inadequate that for all intents and purposes the forum is not available. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, n.22 (1981).

## A.    New Zealand's Forum is Not an Available or Adequate Forum

New Zealand is not an available or adequate forum, and the motion must be denied for that reason alone. Step one of any *forum non conveniens* analysis is to determine whether an adequate alternative forum is available. *Deb*, 832 F.3d at 807. Only if an adequate alternative forum is available does the Court consider its relative convenience. *Id.* It is Gaiman's burden to prove the adequacy of the proposed alternative forum. *Id.* A forum is available only if it allows litigation of the claims. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254, n. 22 (1981) ("dismissal would not be appropriate where the alternative forum does not permit litigation of the … dispute"). More, even if the forum provides some nominal remedy, it is still not an "available alternative" if that remedy is "so clearly inadequate or unsatisfactory that it is no remedy at all." *Id.* at 254. In evaluating whether an alternative forum is available, if there is an unfavorable change in law in the alternative forum, that may be given substantial weight, and the district court may conclude that dismissal would not be in the interests of justice. *Id.*

New Zealand is not an available forum for multiple reasons. First, New Zealand law bars civil claims for damages because of a personal injury. This alone answers the question of whether there is an available adequate forum, and that answer is clearly no. In *Piper*, the Supreme Court held that a forum can only be considered available if it allows for litigation of the dispute. In New Zealand Scarlett is barred from litigating any of her claims with her dispute against Defendant Gaiman.

A plaintiff could not pursue civil claims in New Zealand for compensation from Defendant Gaiman equivalent to those pleaded in the Complaint. Wass Dec. Ex. A at ¶¶ 1.3(a), 2.16(b), (c). New Zealand statutorily barred common law tort claims when they enacted the Accident Compensation Act of 1972, which is a no-fault scheme that provides "cover" for mental and physical injuries very similar to how the worker's compensation scheme works in the United States. *Id.* at ¶ 2.1. Under the ACC a person who has cover is barred from bringing any civil claim for compensatory damages and prohibited from suing the tortfeasor. *Id.* at ¶ 2.16. Further, in addition to the bar of common law claims, there is no provision in New Zealand law equivalent to 18 U.S.C § 1595 conferring a civil right of action. New Zealand enacted s 98D of the Crimes Act 1961, which creates an offence of human trafficking punishable by twenty years' imprisonment and/or a fine of up to $500,000; although one of the purposes of the sections was to protect an identifiable class of people, Parliament contemplated that the appropriate mode of enforcement was criminal sanction. Wass Dec. Ex. A at ¶ 2.28.

New Zealand simply provides no civil cause of action **at all** for Gaiman's human trafficking. *Id.* at ¶ 2.31. Defendant's contrary suggestion in his brief is misleading and an inaccurate statement of the law. *Id.* at ¶ 2.27. As Mr. Wass explains, the case pointed to in Defendant's brief was not a civil claim for compensatory damages for personal injury as a result of human trafficking case, but rather a claim for repayment of money the victim had paid to her traffickers for work in a restaurant in New Zealand's small claims court (the Disputes Tribunal). *Id.* at ¶ 2.34. Under that regime, Scarlett's claim and potential recovery would be the same as if Gaiman had simply forgotten to pay her; the facts and circumstances relevant to her human trafficking claim completely irrelevant to any litigation in New Zealand's Disputes Tribunal. *Id.* at ¶ 2.33 and FN 42.

Indeed, *forum non conveniens* dismissal would be particularly inappropriate for claims based on a statute by which Congress expressed its policy preference that U.S. courts address and remedy

human trafficking conducted by U.S. permanent residents such as Gaiman. *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 105 (2d Cir. 2000) (recognizing that the Torture Victims Prevention Act "expresses a policy favoring receptivity by our courts to such suits" because "the interests of the United States are involved in the eradication of torture committed under color of law in foreign nations"). Because New Zealand provides no remedy at all for Gaiman's human trafficking, it is not an available forum, and the Court's *forum non conveniens* analysis need not go any further. *See Domanus v. Lewicki*, 645 F. Supp. 2d 697, 702 (N.D. Ill. 2009) (Poland not an available forum where it did not recognize plaintiffs' causes of action).[9]

Notwithstanding that Scarlett is barred from bringing a civil claim for compensatory damages, New Zealand is also unavailable for a separate reason. Any action Scarlett might file in New Zealand would subject her, before her claims could proceed to an order requiring security for Gaiman's costs of defense should he succeed in his defense. Wass Dec Ex. A at ¶ 2.37. Scarlett is a student with few if any assets and would not be able to provide security for costs. Pavlovich Dec. ¶ 17. Scarlett definitively cannot litigate any of the claims she has plead in her Complaint in New Zealand. As such, it is not an available alternative forum. Even in the event the Court disagrees and does find that New Zealand is an adequate alternative forum, the analysis of Defendant Gaiman's motion for *forum non conveniens* must continue to the next step. To determine whether a dismissal for *forum non conveniens* is appropriate, a court first must determine if an alternative and adequate forum is available and then go on to balance the interests of the various participants. *Deb*, 832 F.3d at 807. As shown below, the interests of the various participants clearly favor litigation in Western District of Wisconsin and Defendant's Motion should be denied.

---

[9] It is, of course, well-settled that the alternative forum need not provide an identical cause of action to be considered available. *Norex Petroleum, Ltd. v. Access Industries, Inc.*, 416 F.3d 146, 158 (2d Cir. 2005); *see also PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 74 (2d Cir. 1998). But Scarlett's human trafficking claim is not just a differently named path to redress for her abuse at Gaiman's hands; as Congress recognized, it is a separate and distinct class of harm that must be combatted, and which requires its own remedy.

Defendant's reply will no doubt point to decisions such as *Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2001), in which the Ninth Circuit held that New Zealand was an adequate alternative forum because the ACC remedy available in New Zealand included "compensation [for] their physical injuries sustained in the accident and the resulting loss of earnings," which were the damages they sought in the claim they filed in the United States. *Id.* at 1144. Under such circumstances, that New Zealand imposed a damages cap that meant the plaintiffs would recover *less* did not render the forum inadequate, because it allowed recovery for the losses at issue. *Id. Lueck* cited other cases which had similarly found New Zealand's scheme not inadequate for the same reasons. *Id.*

But those cases are not applicable here, because New Zealand does not allow damages for mental injury, which is what Scarlett seeks to recover here. Wass Dec. Ex. A. at ¶¶ 2.16(b), (c), (d), and (e)**.** Rather, the relevant remedy for Scarlett's mental injury that New Zealand offers through the ACC is treatment via a New Zealand-licensed  mental health provider. *Id.* at ¶ 2.13.  However, this is remedy is not available for Scarlett because she is a nonresident of New Zealand living in Scotland with no ability to receive the treatment in New Zealand. Pavlovich Dec. ¶¶19-21. That is not the "same damages remedy, just less of it" that *Lueck* and cases like it found sufficient. New Zealand offers *no remedy at all* for Scarlett's past pain and suffering or rehabilitative care. *That* remedy, in *this* case, is the quintessential remedy in name only, tantamount to no remedy at all. Scarlett no longer lives in New Zealand and has no intention of returning to New Zealand to visit or live. *Id.* at ¶ 4. In fact, Scarlett is currently working with an advocacy group in Scotland called the Scottish Women's Rights Center to legally remain in the UK indefinitely. *Id.* at ¶ 5. Scarlett has received confirmation from the ACC that no rehabilitative care is available to her because she lives abroad. Pavlovich Dec. ¶ 21 and Ex. 1. Scarlett has no intention of ever returning to New Zealand and therefore the only possible relevant remedy (rehabilitative care) is not available at all.

As the Eastern District of Louisiana explained in *Sector Nav. Co. v. M/V CAPTAIN P*, No. CIV A 06-1788, 2006 WL 2946356 (E.D. La. Oct. 13, 2006), "[i]f the language in *Piper* means anything, then there must be some level at which a remedy, although available, becomes 'so clearly inadequate or unsatisfactory that it is no remedy at all.'" *Id.* at 7 (*quoting Piper Aircraft*, 454 U.S. at 254, and holding that Nigeria's draconian cap on recoveries was at that level). Whatever the status of New Zealand as an adequate forum to recover for physical injuries or economic losses in a car accident, New Zealand law provides no remedy that is available at all for non-New Zealand residents who have suffered mental harm from sexual abuse when the victim, like Scarlett, is no longer residing in New Zealand.  That mental health injury is the heart of this dispute, and Scarlett cannot access the therapeutic or rehabilitative services she needs in New Zealand while attending school in Scotland. Pavlovich Dec. ¶ 21 and Ex. 1. New Zealand is not an available or adequate forum.

**B.     Scarlett's Choice of Forum is Entitled to Deference**

While a foreign plaintiff's decision to litigate in a U.S. defendant's home forum is entitled to less deference than a U.S. citizen's decision to litigate in the U.S., it is still entitled to some deference, because "the issue is not so much about the foreign citizenship of the plaintiff, but rather what that foreign nationality might indicate about the convenience to the plaintiff." *Deb*, 832 F.3d at 806 (presumption still applied, albeit with less force, for Canadian plaintiff than litigation in India). Here, litigation in Wisconsin is **dramatically** more convenient for Scarlett, for a number of reasons discussed in detail below (briefly: it is far closer to her home in Scotland than New Zealand, allowing her to communicate with counsel and participate in the litigation remotely during reasonable hours, and making travel to the forum when necessary both more convenient and less expensive, Gaiman appears to actually reside here (in the sense of maintaining a domicile) and is therefore most likely to be found here for purposes of discovery and deposition). The U.S. forum also allows Scarlett to

coordinate her litigation against Gaiman with her litigation against Palmer, who (like Gaiman) has permanently moved from New Zealand and conveyed that she intends to litigate Scarlett's claims in Massachusetts.

Furthermore, Scarlett sued Gaiman in his home forum, that increases the deference due her forum choice. The Seventh Circuit has held that even where a defendant seeks to have a suit in his home forum dismissed in favor of the plaintiff's home forum, the plaintiff's forum choice is due *some* deference, acting as a tiebreaker though it is unlikely that either party will face difficulty litigating in their home forum. *See Instituto Mexicano del Seguro Soc. v. Zimmer Biomet Holdings, Inc.*, 29 F.4th 351, 358 (7th Cir. 2022). Here, Gaiman seeks to dismiss this action not in favor of litigation in Scotland, where Scarlett (the significantly less-resourced party) resides, but in New Zealand, where she is a citizen but does not reside.  Pavlovich Dec. ¶¶ 2-3. Under the circumstances, where any forum she chose would be distant from her home, but one (Wisconsin) is significantly more geographically convenient than the other (New Zealand), the Court should afford her choice significant deference. *Cf. Ramirez de Arellano v. Starwood Hotels & Resorts Worldwide, Inc.*, 448 F. Supp. 2d 520, 526 (S.D.N.Y. 2006) (that New York was significantly closer to plaintiff's Puerto Rico home than Spain supported affording plaintiff's choice of forum deference).

## C.    New Zealand is Not a More Convenient Forum

Even were none of that true, New Zealand also is not a more convenient forum for the parties. In analyzing the relative convenience of the forums, the Court must consider both the private interests of the parties (the extent to which litigation in either forum would be more or less convenient for them) and the public interests of the forums. Both strongly favor that jurisdiction be retained in Wisconsin.

1.  <u>The Private Interests Favor Litigation in Wisconsin</u>

First, the private interests of the parties' favor litigation in this District. The private interests relevant to a *forum non conveniens* analysis include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). Gaiman has the burden of establishing that the balance of the factors favors dismissal. *See Lacey v. Cessna Aircraft Co.*, 862 F.2d 38, 43–44 (3d Cir. 1988) ("It is settled that the defendant bears the burden of persuasion as to all elements of the *forum non conveniens* analysis"). He has not carried it.

First, New Zealand is a significantly less convenient geographical forum for Scarlett, Gaiman, and the key non-party witness, Palmer. None of the parties and key witness to this action – Scarlett, Gaiman, or Amanda Palmer – currently live in New Zealand. While Scarlett is a New Zealand citizen and Gaiman and Palmer are each legally *allowed* to travel to and be in New Zealand if they choose to, none currently lives in New Zealand. As an officer of NEVERWHERE, LLP, a company formed under the laws of the United Kingdom, Neil Gaiman is required to disclose his nation of residence to Companies House, the government body which oversees corporate activity in the UK, see The Limited Liability Partnerships (Application of Companies Act 2006) Regulations 2009, 2009 No. 1804 (UK) https://www.legislation.gov.uk/uksi/2009/1804/part/8A.[10] The

---

[10] Gaiman is designated as a Person with Significant Control (a PSC) of Neverwhere, LLP. Pursuant to the Companies Act of 2006, c. 46 (U.K.), https://www.legislation.gov.uk/ukpga/2006/46/contents and the The Limited Liability Partnerships (Application of Companies Act 2006) Regulations 2009, 2009 No. 1804 (U.K.) https://www.legislation.gov.uk/uksi/2009/1804/contents, Neverwhere is obligated to report certain required particulars of its PSCs. As is relevant here, the required particulars include "the country or state (or part of the United Kingdom) in which the individual is usually resident." Regulation 31D, https://www.legislation.gov.uk/uksi/2009/1804/contents (applying Section 790K(1)(d) of the Companies Act of 2006 to LLPs). An LLP must keep a register of its PSCs and must not record their required particulars until they have been confirmed. Regulation 31E, https://www.legislation.gov.uk/uksi/2009/1804/regulation/31E (applying Section 790M(3)

company information for NEVERWHERE LLP indicates that he is a resident of the United States.
Schmeyer Dec. ¶ 5 and Ex. 4.  Palmer moved from New Zealand years ago, and currently resides in
Lexington, Massachusetts, as she announced on her Instagram profile on September 17, 2025 ("Hi
Boston. I've moved back home. [...] After almost twenty years of non-stop travel and hotels and
couch-surfing and tour busses, then living out of a suitcase in Aotearoa New Zealand for two and a
half years (after getting waylaid there in 2020 when COVID hit), then living in a bit of a temporary
stone hallway in Woodstock, New York, for two years…I'm finally at home base. Safe and sound
here in good ol' puritan New England and ready to freak out the locals.") Schmeyer Dec. ¶ 6 and
Ex. 5, and as was confirmed by the effectuation of service on Palmer personally at her home in
Lexington, MA. Schmeyer Dec. ¶ 7 and Ex. 6. Scarlett is a student who resides in Scotland.
Pavlovich Dec. ¶ 3. And Gaiman, by his own admission and contrary to the impression given by his
Declaration, resides and owns property in this District[11], [12]. Schmeyer Dec. ¶¶ 8-9 and Exs. 7-8
(Deed and property summary showing Gaiman's property ownership in Menomonie, WI); ¶¶ 10-11
and Exs. 9-10 (Gaiman's social media posts referencing "[his] Wisconsin house" and describing
himself as an "English author in Wisconsin" who has "had a green card since 1992.").  Scarlett has
attested she has no intention of ever returning to New Zealand as a result of the abuse she suffered

---

of the Companies Act of 2006 to LLPs). Moreover, an LLP must give notice to the registrar within 14 days of making such a change. Regulation 31JA, https://www.legislation.gov.uk/uksi/2009/1804/regulation/31JA (applying Section 790VA(2) and (4) of the Companies Act of 2006 to LLPs). Failure to do so is a criminal offense. *Id.* The last such notice to the registrar was June 6, 2024. As of April 11, 2025, Mr. Gaiman's Country of Residence remains the United States.

[11] The representation that this suit was "brought by a New Zealand citizen, against a New Zealand resident," Doc. No. 19 at 9, made by Gaiman's counsel benefits from the fact that the word "resident" and its variants mean different things depending on the context. For example, "residency" for purposes of the UK's Persons with Significant Control status refers to the place where a person primarily resides. "Permanent resident" status in the context of a New Zealand visa refers to the ability to enter and leave New Zealand at will, much like Mr. Gaiman's status as a lawful permanent resident of the United States allows him to travel the world and return to Wisconsin when he wishes. The fact that counsel qualified the representation with a footnote citing to Gaiman's declaration for the fact that Gaiman is a "permanent resident," provides the critical context that Gaiman's status as a permanent resident of New Zealand is not equivalent to a representation that he lives in New Zealand full time. *Id.*

[12] There is still more evidence that Gaiman owns property in this District, but the evidence supplied here amply demonstrates his presence in the forum for purposes of addressing his *forum non conveniens* argument.

there. Pavlovich Dec. ¶ 4. Her intention is to remain in the UK and is currently working through the process to legally stay in the U.K. indefinitely. *Id.* at ¶ 5. Further, Scarlett does not have the financial ability to return to New Zealand even if she wanted to. *Id.* at ¶ 22.

There are three – and only three – key witnesses relevant to the claims in this action. They are the only witnesses to the agreement between Gaiman and Palmer on the one hand, and Scarlett on the other, that Gaiman and Palmer would pay Scarlett to work as their live-in nanny. *Id.* at ¶ 8. Gaiman's sexual misconduct of Scarlett occurred either when he was alone with Scarlett or when he and Scarlett were accompanied only by his child; no other witness could testify to them. *Id.* at ¶ 16.

Litigation in New Zealand would pose severe practical and economic hardships that litigation in Wisconsin does not. Take travel, for example. As of April 10, 2025, a round-trip flight from Edinburgh to Auckland on Wednesday May 7, returning Wednesday May 14, would cost a minimum of $1,494 and take a minimum of 24 hours, 35 minutes. Schmeyer Dec. ¶ 12 and Ex. 11. A trip on the same dates from Edinburgh to Madison would cost $995 and take almost half the time. *Id.* at ¶ 13 and Ex. 12. Gaiman, of course, would have no travel burden litigating in his home forum. Or consider communication with counsel. Scarlett's American counsel is located in New York, Texas, and Colorado – 4-6 hours behind Edinburgh time, meaning they and Scarlett have overlapping business days. Auckland is 13 hours ahead of Edinburgh, meaning that Scarlett would need to routinely (and could only) communicate with any New Zealand-based counsel outside of reasonable hours (whether hers or counsel's), limiting them, as a practical matter, to (for at least one party) communications in the early morning or very late at night. Not only is that *generally* inconvenient, but it is also likely to meaningfully decrease both the frequency and efficacy of Scarlett's communications with counsel as compared to litigation in this District and is therefore likely to substantively prejudice her.

The same applies – but with even more force – to Gaiman. For all his attempts to obfuscate it in his declaration, Gaiman *lives* in this District and litigation here would self-evidently be significantly more convenient, geographically, than litigation half-a-world away in New Zealand – even if he would strategically prefer to litigate in New Zealand. That is equally true for Palmer, who will be involved in this action as a non-party witness. She already has able U.S.-based counsel defending her in Massachusetts. Schmeyer Dec. Ex. 3. That counsel can represent her in connection with any discovery in this action but presumably is not licensed in New Zealand and therefore would be unlikely to be able to do so with respect to anything involving New Zealand litigation. Schmeyer Dec. ¶ 14 and Ex. 13.

The second major way that New Zealand litigation would be significantly less convenient than litigation in this district: the inability to coordinate litigation of Scarlett's claims against Gaiman with her litigation, arising out of the same nexus of facts, of her claim against Palmer. Palmer has conveyed that she intends to litigate her dispute with Scarlett in the District of Massachusetts. *Id.* at ¶ 4. If this action is transferred to New Zealand, Scarlett will need to retain New Zealand counsel and proceed in New Zealand against Gaiman, while continuing to retain U.S.-based counsel and litigating against Palmer in the United States. More, while Scarlett intends to seek consolidation (as a Multi-district Litigation for purposes of discovery) of this action with the litigation against Palmer, there is no mechanism by which New Zealand litigation against Gaiman could be coordinated with American litigation against Palmer. Wass Dec. Ex. A at ¶ 2.38. Thus, for the core claims and core relevant witnesses, litigating Scarlett's claims against Gaiman in this district would be significantly more convenient than litigating them in New Zealand.

Third, Gaiman's proposed array of ancillary witnesses are both insufficient to overcome that and overlooks that mechanisms are available under New Zealand law to collect evidence in support of proceedings in this District. The High Court of New Zealand has authority to compel discovery

in the form of depositions and written discovery of foreign proceedings.  Wass Dec. Ex. A ¶ 4.7. The High Court of New Zealand takes requests for compulsory discovery for a foreign proceeding seriously and while those requests in foreign proceedings for compulsory discovery to the High Court are infrequent, they have almost always been granted by the High Court. *Id.* at ¶ 4.6. As such Defendant Gaiman's argument that compulsory depositions are not permitted in New Zealand is inaccurate, as New Zealand law empowers the High Court of New Zealand to order the oral examination of witnesses. *Id.*

In any event, Gaiman's conclusory argument that various individuals "can dispute" Plaintiff's claims are woefully insufficient to carry his burden on this issue. Gaiman needs to show that the witnesses available in New Zealand are key witnesses with crucial evidence. *See Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1348 (11th Cir. 2020) (motion denied where movant failed to explain why witnesses it referred to were "key"); *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1231 (9th Cir. 2011) ("the focus for this private interest analysis should not rest on the number of witnesses in each locale but rather the court should evaluate the materiality and importance of the anticipated witnesses testimony")(cleaned up). And he needed to show that those witnesses would be unwilling to testify without compulsory process, which process would be available only if the litigation proceeded in New Zealand. *See Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir.2006) ("When no witness' unwillingness has been alleged or shown, a district court should not attach much weight to the compulsory process factor"); He did neither.

Gaiman's declaration references – by initials only – a number of individuals unknown to Plaintiff who purportedly "can dispute Pavlovich's" claims. Doc. No. 22, ¶ 10. Yet Gaiman provides *no* detail about the manner in which they could supposedly dispute the claims, the specific facts alleged in the Complaint with which they would disagree, or the relevance or admissibility of their supposed testimony, from which Scarlett or the Court could assess their relative importance to the

litigation for purposes of the *forum non conveniens* analysis. Gaiman's list of potential witnesses is considerably inflated in his brief, including:

- "Ferry company employees" and records to testify about when people were on Waiheke Island (without any indication that is a matter in dispute, or that public transportation company employees would remember the dates of travel of three people in February 2022);

- Unspecified "guests" of Amanda Palmer's, to testify about unspecified "interactions";

- "Individuals who watched Gaiman's child" – presumably the adults at whose home Gaiman left his son the day he first assaulted Scarlett – who Gaiman claims will "dispute" unspecified facts about the allegations despite not being present for the bath he claims he 'consensually' took with Scarlett that day; and

- Hotel employees and records (without any explanation of how they could "[d]ispute Plaintiff's claims of hotel assault" when the assault occurred in a hotel room in which only Gaiman, Scarlett, and Gaiman's child were present). Doc. No. 19 at 14.[13]

Nor does Gaiman provide any evidence that those witnesses (including his friends and personal assistant) would be unwilling to testify without compulsory process. And, in any event, New Zealand law has mechanisms for the collection of evidence, including documents, in New Zealand for use in a foreign litigation. Wass Dec. Ex. A ¶¶ 4.6-4.8. Gaiman's apparent desire to call his friends and neighbors to discuss the various moments they witnessed him is thus woefully insufficient to carry his burden.

With respect to documents, Gaiman does identify some relevant evidence which is in New Zealand: Scarlett's medical and financial records. But those documents obviously can be obtained electronically from the provider directly or from Scarlett **regardless** of where the litigation proceeds. Similarly, any witness in New Zealand or elsewhere who would willingly testify – or from whom

---

[13] Gaiman makes much of the hundreds of text messages he introduces as extrinsic evidence, claiming that they "tell a very different story than the one Plaintiff pleads" in her complaint. Scarlett is confident that the deliberative process of examination and trial will vindicate the truth of her claims; however, this is not the appropriate stage of litigation for that determination. *In re Consolidated Industries*, 360 F.3d 712, 717 (7th Cir. 2004), *citing International Marketing, Ltd. v. Archer-Daniels-Midland Co.*, 192 F.3d 724, 730 (7th Cir. 1999) ("A judge reviewing a motion to dismiss under Rule 12(b)(6) cannot engage in fact-finding.").

Gaiman could compel testimony through an order from the New Zealand High Court – can be deposed remotely, as is now commonplace in modern litigation. For precisely that reason, courts have long since concluded that the location of witnesses and documents is essentially irrelevant to the *forum non conveniens* analysis today absent some **specific, articulable** prejudice in a particular case that would make production from outside the forum unusually inconvenient. *See Salebuild, Inc. v. Flexisales, Inc.*, 633 F. App'x 641, 643 (9th Cir. 2015) (location of witnesses irrelevant "in this age of robust video conferencing technology"); *Lynn v. Becton Dickinson & Co.*, No. 2:21-CV-5004, 2022 WL 610819, at *4 (S.D. Ohio Mar. 2, 2022) ("The location of witnesses similarly carries little weight given the widespread availability of video conferencing"); *Ganpat v. E. Pac. Shipping, PTE. LTD*, 581 F. Supp. 3d 773, 789 (E.D. La. 2022) (location of witnesses all but irrelevant now that courts and parties "have amassed experience in conducting business via ZOOM and similar video conferencing technologies"); *Fruitstone v. Spartan Race Inc.*, 464 F. Supp. 3d 1268, 1282 (S.D. Fla. 2020) (location of documents "virtually irrelevant" given realities of electronic production).[14]

Thus, taken together, the private interest factors strongly favor litigation in the United States and in this district. That is particularly true where while Gaiman is well-resourced, Scarlett is not, and inconvenience to her would be significantly more burdensome in comparison. *See Ramirez de Arellano*, 448 F. Supp. 2d at 530 (private interests analysis must consider "the disparity of means between the parties") (emphasis altered).

2.  <u>The Public Interest Factors Strongly Favor Litigation in This District</u>

The public interest factors likewise strongly support retention of jurisdiction. As an initial matter, Gaiman is simply incorrect when he suggests that New Zealand law statutorily addresses Scarlett's TVPA claims; its law provides no private right of action for human trafficking. Wass Dec.

---

[14] *Fruitstone* and *Salebuild* considered *forum non conveniens* motions in the context of an argument to transfer to a different U.S. district court; that does not alter the conclusion that the location of documents and witnesses is no longer a convenience concern relevant to the private interest factors.

Ex. A at ¶ 2.27. That alone should be dispositive, given the public policy preferences that motivated and are embodied in the TVPA.[15] *Cf. Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 339 (S.D.N.Y. 2003) (citing "the strong United States interest in vindicating international human rights violations" as militating against *forum non conveniens* dismissal of Alien Tort Statute action), *rejected on other grounds by Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 140 (2d Cir. 2010) (*Presbyterian* court erred in its analysis of corporate liability under international law), *aff'd*, 569 U.S. 108 (2013).

Those public policy concerns were extensively discussed by the Fourth Circuit in *Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019). Congress passed the TVPA to "combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 917 F.3d at 235–36, *quoting* TVPA, Pub. L. No. 106-386, § 102(a), 114 Stat. 1464, 1466 (codified at 22 U.S.C. § 7101(a)). Congress "repeatedly emphasized the transnational nature" of the problem and the enforcement challenges posed by its international scope. *Id.* The statute was first passed in 2000, and then amended in 2003 to add a private right of action given "the challenges that remained 'in responding to <u>the needs of **victims of trafficking** in the United States **and abroad**</u>.'" 917 F.3d at 236 (emphasis added), *quoting* Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, §2(2), 117 Stat. 2875. In 2006, Congress expanded the reach of the TVPA to cover extraterritorial conduct by Federal employees and contractors, and in 2008, it further expanded the TVPA to cover extraterritorial conduct by U.S. nationals or permanent residents (such as Gaiman). *Id.* at 237. As the Fourth Circuit explained, the "purpose, structure, history, and context of the TVPA" all make clear that the civil remedy of Section 1595 was intended to be available to a foreign

---

[15] Gaiman's blithe assertion that there "is no U.S. public policy at issue in this suit", Doc. No. 19 at 22, is telling.

plaintiff injured by foreign conduct so long as the predicate offense is one that applies extraterritorially. *Id.* at 242 ("the TVPA represents a far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims"); *accord U.S. v. Baston*, 818 F.3d 651, 671 (11th Cir. 2016) (holding that "Congress has the power [under the Foreign Commerce Clause] to require international sex traffickers to pay restitution to their victims even when the sex trafficking occurs exclusively in another country.").

In other words, Congress passed – and the President signed into law – a statutory regime specifically designed to allow victims of foreign conduct to seek redress in United States courts. It did so based on the United States' strong interest in combatting human trafficking by U.S. nationals and permanent residents, and in (and after) recognition of the fact that criminal law alone was insufficient to address the problem. To superimpose onto *that* regime a standard *forum non conveniens* analysis, in which a foreign plaintiff's suit over foreign conduct is shunted out of the American courts for reasons of convenience would be to essentially write that policy choice out of existence. Few if any cases of extraterritorial conduct encompassed by the TVPA would not, for example, turn on conduct in a foreign location, with witnesses and documents primarily located abroad. Few if any would involve a U.S. citizen plaintiff suing in her home forum. Few if any would fail to require a U.S. jury to pass on foreign conduct or involve no issues of foreign law. The United States, in other words, has directed that claims such as Scarlett's should be heard here, in U.S. courts, as a matter of U.S. public policy. The doctrine of *forum non conveniens* cannot override that – and even if it could in theory, given such a declaration of U.S. policy the public interest factors overwhelmingly favor retention of jurisdiction, such that the balance of private convenience would need to tip even more overwhelmingly in Gaiman's favor to overcome that. As shown above, they do not.

3.   The Interests of Justice Favor the Western District of Wisconsin

Finally, the interests of justice strongly favor retaining jurisdiction. Consideration of the interests of justice includes judicial economy. *Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1565 (Fed.Cir.1997) ("*Eli Lilly*"). The interests of justice may be determinative to a particular transfer motion even if the convenience of the witnesses and parties might call for a differed result. See *Eli Lilly*, 119 F.3d at 1565 (district court did not abuse its discretion in denying transfer of case after finding judicial economy would be served by retaining the case*); Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 220–21 (7th Cir.1986). Judicial economy will be served here because the claims against the Defendant are under United States law, which comes with significant policy considerations to prevent sexual abuse victims from being trafficked; the Defendant is local to this District; it is far more convenient and less costly for the Plaintiff to travel to the Western District; and the primary non-party witness, Palmer resides in the USA, in Massachusetts.  Here, that weighs in favor of retaining jurisdiction, not transfer to New Zealand.

Indeed, even if the Court determines that New Zealand is technically both an adequate and available forum, that will not make transfer of **this** case and **this** Plaintiff's claims just. As Mr. Wass explains, cover under New Zealand's accident compensation scheme would not need to involve any adjudication, public or private, of Scarlett's factual claims. Wass Dec. Ex. A at ¶ 2.11. Further, as discussed more fully herein, any relevant remedy under the ACC is unavailable to Scarlett because she lives abroad.  As a practical matter, dismissal of this action in favor of proceedings in New Zealand will mean that there is no prospect that Gaiman will be held accountable for his abuse of Scarlett; that is not in the interest of justice. *Id.* at ¶ 2.16. Nor does the interest of justice analysis need to presume that Scarlett will succeed in her claim; if she were the fabulist Gaiman claims she is – and, of course, she is not – the interest of justice would be served by an adjudication finding as much (which Gaiman pointedly but not at all surprisingly seeks to avoid the opportunity for).

Simply put, this is not an accident claim where the question is private allocation of loss, or a commercial dispute. Rather, Scarlett seeks redress for Gaiman's deliberate, predatory assault on her in a manner that shocks the conscience, and in violation of this country's policy against its denizens engaging in human trafficking.[16] The interests of justice demand that Scarlett's claims be adjudicated, not shunted off to an administrative procedure behind closed doors. Even if none of the other factors favored Scarlett – and, as noted above, they each do – that alone would be reason enough to deny the motion.

### 4.    Scarlett Did Not Contract to Sue in New Zealand

Finally, the "employment contract" Scarlett signed is irrelevant for three reasons. First, as Scarlett pled in her Complaint, Gaiman required her to sign the employment agreement after her employment had terminated. Pavlovich Dec. ¶ 15. As such, the contract is unsupported by consideration and unenforceable. Wass Dec. Ex. A. at ¶¶ 3.5, 3.8-3.11.

It is also irrelevant. The jurisdiction clause of the contract applies only to suits regarding interpretation of the agreement. Wass Dec. Ex. A at ¶¶ 3.18-3.19, This suit does not arise out of the employment agreement, and Scarlett brings no claims based on it. So, on its face, the jurisdiction clause does not apply. Indeed, American law would reach the same conclusion. In *Wisconsin Freeze Dried LLC. v. Redline Chambers, Inc.*, 375 F.Supp.3d 1038 (E.D. WISC), the court analyzed the forum selection clause and held the forum selection clause did not apply to all claims. *Wisconsin Freeze Dried LLC*, 375 F.Supp.3d at 1041 ("[t]his Agreement shall be construed under Wisconsin law, which implied that 'the forum' meant the forum for claims involving that very agreement, and non-disclosure agreement was not intended to cover all aspects of the parties' relationship").

---

[16] Or, even adopting Gaiman's framing, it is a blackmail attempt that is causing him significant harm and demands to be adjudicated.

Finally, to the extent that the jurisdiction clause would apply to Scarlett's TVPA claim, it would obviously be void as contrary to public policy. See Dougherty, Validity of Contractual Provision Limiting Place or Court in Which Action May Be Brought, 31 A.L.R.4th 404, 409, § 3 (1984). ("contractual provisions, which seek to limit the place or court in which an action may ... be brought, are invalid as contrary to public policy."). Self-evidently, U.S. nationals and permanent residents subject to the TVPA cannot be allowed to immunize themselves from its provisions by requiring their victims to contract away their ability to bring TVPA claims. That Gaiman would even contemplate suggesting otherwise smacks of desperation.

## II. <u>This Court Has Jurisdiction over Scarlett's TVPA Claims and Gaiman's 12(B)(6) Motion Must Be Denied.</u>

On a motion to dismiss for failure to state a claim, the well-pled allegations of the Compliant must be assumed to be true and all reasonable inferences drawn in favor of the Plaintiff. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Here, Gaiman does not deny that Scarlett has properly pled each and every element of a human trafficking claim under the TVPA. He thus tacitly acknowledges that the conduct described in the Complaint is, in fact, the conduct criminalized by the TVPA, and that he would be subject to prosecution if that conduct were pursued criminally and proven beyond a reasonable doubt. Rather, Gaiman argues only that, under the TVPA, Congress only provided victims of human trafficking by U.S. residents with a right to **civil** recovery for the harm caused by their abusers if the criminal conduct occurred in the United States.[17] But as multiple courts have found, that is simply not so.

The only decision directly on point at the appellate level is found in the Fourth Circuit's decision on this issue in *Howard*, which is particularly instructive, not least for the factual overlap in the claims. *Howard*, *supra*, 917 F.3d 229. Like Gaiman, the bad actors in *Howard* were American

---

[17] Gaiman's argument is essentially "it's only tortious human trafficking under the TVPA if it happens in America. Anywhere else and it's just sparkling sex slavery."

residents living overseas – an American diplomat, Linda Howard, and her husband, Russell, who were living in Sana'a, Yemen while Russell sexually abused a domestic employee Linda had procured for him. *Id.*, at 233, 234-235. After a jury in the Eastern District of Virginia found Linda (and her husband's estate) liable to the employee under the TVPA and awarded her victim $3,000,000.00, Linda moved for a judgment as a matter of law on the basis that the TVPA's civil provisions did not apply extraterritorially. *Id.* at 233. When that motion was denied, Linda appealed. *Id.*

The Fourth Circuit thoroughly explained that Linda was wrong. Congress enacted the TVPA in 2000 to combat transnational human trafficking and sexual exploitation, creating "several new federal criminal offenses intended to more comprehensively and effectively" address the problem, including 18 U.S.C. 1589, 1590, and 1591. *Howard*, 917 F.3d at 236. In 2003, Congress amended the statute to provide a civil remedy for violations of the TVPA, allowing "an individual who is a victim of a violation [to] bring a civil action against the perpetrator … in an appropriate district court of the United States." *Id.* (quoting 18 U.S.C. §1595(a), alteration altered). In 2006, Congress expanded the TVPA's extraterritorial reach to conduct by government employees and contractors outside the United States, expanding the conduct that would be a "violation" allowing a victim to "bring a civil action against the perpetrator" in U.S. courts. *Id.* at 236-37. And in 2008, Congress further expanded its reach to cover any violation of Sections 1589-1591 anywhere in the world. *Id.* at 237. Applying the framework for assessing extraterritoriality supplied in *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016), the Fourth Circuit had little difficulty concluding that Congress intended the TVPA to apply extraterritorially and therefore displaced any contrary presumption that might otherwise limit 18 U.S.C. § 1595. *Howard*, 917 F.3d at 241:

> Of crucial importance, § 1595 directly incorporates predicate offenses that govern foreign conduct, providing strong textual evidence of its extraterritorial effect when applied to those predicates. … Additionally, the purpose, structure, history, and context of the TVPA militate toward the extraterritorial application of § 1595, to the extent that the relevant predicate offenses reach the challenged foreign conduct at issue.

31

*Id.* Thus, the Court was satisfied that "§ 1595 reflects congressional intent that it applies extraterritorially to the extent that a plaintiff seeks redress for a predicate offense that is itself extraterritorial." *Id.* at 242. More, "the purpose, structure, history, and context of the TVPA" all supported construing Section 1595 as applying extraterritorially (as to any offenses that themselves apply extraterritorially), because the TVPA pervasively references international issues and Congress enacted it as a "far-reaching congressional effort to combat transnational human trafficking on numerous fronts, including by expanding the civil claims and remedies available to its victims." *Id.* Because Congress was "clearly concerned with international rather than purely domestic matters… unduly limiting the TVPA's scope risks frustrating its animating purpose." *Id.*

Numerous other courts have reached the same conclusion. The Ninth Circuit recently devoted an opinion to determining whether the 2008 amendments were retroactive, allowing civil claims for extraterritorial violations that occurred before 2008, or only allowed civil claims for extraterritorial violations occurring after 2008; there was no dispute that the civil remedy provision applied extraterritorially to violations occurring after 2008. *Ratha v. Rubicon Res., LLC,* 111 F.4th 946, 953 (9th Cir. 2024) (concluding that the provision was not retroactive), *reh'g en banc granted, opinion vacated*, No. 23-55299, 2025 WL 689487 (9th Cir. Mar. 4, 2025).[18] *See also Adhikari v. KBR Inc. (Adikhari II)*, No. 4:16-CV-2478, 2017 WL 4237923, at *5 (S.D. Tex. Sept. 25, 2017) (the 2008 amendments allow for such claims only based on post-2008 conduct); *Adhikari v. Daoud & Partners (Adhikari I)*, 994 F. Supp. 2d 831, 840 (S.D. Tex. 2014) (concluding that the 2008 amendments created civil liability for extraterritorial conduct only on a going-forward basis), *aff'd sub nom Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 200 (5th Cir. 2017);  In *U.S. ex rel. Fadlalla v. DynCorp Int'l LLC*, 402 F. Supp. 3d 162, 198 (D. Md. 2019), the District of Maryland allowed a civil claim brought

---

[18] Granting the plaintiffs' petition for rehearing *en banc* to allow the full court to consider retroactivity.

pursuant to Section 1595 of the TVPA to proceed where it was based on conduct occurring in Kuwait. *Id.* at 197-199.[19] In *Abernathy v. Carlyle Grp., Inc.*, No. CV 22-3603 (ABJ), 2024 WL 5331993, at *14 (D.D.C. Sept. 27, 2024), the District of Columbia held that the TVPA's civil remedies provision "applies extraterritorially to the extent that the offenses for which it supplies a private right of action have extraterritorial application." *Id.* at *13. And it did the same in *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2024 WL 4332117 (D.D.C. Sept. 27, 2024). (a companion case to *Abernathy* on the same facts, decided together by Judge Berman Jackson).

Those conclusions are, effectively, directly compelled by the text of the relevant statutes. Section 1595 of the TVPA provides a right to maintain a civil action in U.S. district courts to any "individual who is a victim of a violation of this chapter." 18 U.S.C. § 1595. And Section 1596 of the TVPA, adopted (as noted above) *after* Congress had extended a private right of action to victims of violations of Chapter 77 of Title 18, extended the statute's reach to cover even purely extraterritorial conduct "under section 1581, 1583, 1584, 1589, 1590, or 1591." *Id.*, § 1596. As such, Gaiman's conduct alleged is (as he concedes) "a violation" of Chapter 77, and Scarlett is "an individual who is a victim of" such a violation and therefore entitled to sue in any appropriate U.S. district court.

Against this line of precedent, clear text, and extensive legislative history, Gaiman relies solely on a decision in the District of Columbia, *Doe I*, which is not only an outlier, but has been specifically rejected within that same District.[20] In *Doe I*, Judge Nichols first ruled that the case had to be dismissed because the plaintiffs lacked standing. 2021 WL 5774224, *6-8 ("The injuries Plaintiffs suffered are horrifying. But it takes many analytical leaps to say that the end-purchasers of a fungible metal are

---

[19] Because the conduct at issue was committed between the 2006 and 2008 amendments and by a government contractor, the court focused on the 2006 amendment's extraterritoriality provisions rather than decide whether the 2008 amendment was retroactive.

[20] As noted above, Gaiman's placement of his parenthetical description of *Doe I*, "(holding that Congress did not authorize extra-territorial jurisdiction for civil remedies under § 1595)" after the citation to the appellate decision in *Doe I* rather than between "(D.D.C. Nov. 2, 2021)" and "*aff'd sub nom.*", *see* Doc. No. 19 at 26, misleadingly suggests that the D.C. Circuit affirmed that holding. It did not.

responsible for the conditions in which that metal might or might not have been mined"). He then ruled that the court lacked personal jurisdiction over Dell. *Id.*, *9-10. Having already ruled that the claims were subject to dismissal, Judge Nichols then found that the plaintiffs had failed to substantively allege any violation of the TVPA, for multiple reasons. *Id.*, *10-14 (finding that plaintiffs failed to sufficiently allege "participation in a venture" under § 1595 or any underlying violation of sections 1589 or 1590). Only after finding the claims dismissible for each of those reasons did Judge Nichols turn to extraterritoriality.

As to that, Judge Nichols noted that Section 1595's text did not expressly include extraterritorial application and found it significant that the list of provisions in Section 1596 for which Congress specified operated extraterritorially did not include Section 1595. *Id.* at 14-16. Because it "seem[ed] likely" that Section 1595's omission from 1596 "was not mistaken," Judge Nichols concluded that reflected "an intentional decision not to extend extraterritorially the reach of the statute's civil component." *Id.* at 16. On appeal, the D.C. Circuit reversed as to standing but affirmed as to the failure to allege the defendants' "participation in a venture," and therefore affirmed the dismissal. *Doe 1*, 96 F.4th at 406. It did not reach Judge Nichols' alternative conclusions about extraterritoriality.

In both *Abernathy* and *Hawkins*, however, Judge Berman Jackson considered and not only rejected but convincingly refuted Judge Nichols' analysis:

> The Court is not persuaded by this analysis. First, it fails to take into account the order in which the various provisions were enacted. When the statute was first passed in 2000, it included some extraterritorial offenses. It was after that, in 2003, that Congress announced that a victim could bring a civil action for violation, and it added more extraterritorial provisions. And it was only after that, in 2008, that Congress expressed is [sic] intention in section 1596(a) that other offenses should also have extraterritorial reach. So it would be inappropriate to predicate a narrowing construction of the civil provision on a later, unrelated amendment to the statute.
>
> Second, the Doe opinion finds meaning in the fact that the civil remedy provision, section 1595, was not listed in 2008 when Congress identified additional provisions that could be applied abroad. … But that would not have made sense. Section

> 1956(a)[sic] listed "offenses" over which courts would have extraterritorial jurisdiction, and section 1595 is not an "offense" – it is a free-standing provision that creates a civil remedy for an "offense," that is, any "violation of this chapter." 18 U.S.C. § 1595(a).
>
> The Court finds the Fourth Circuit decision in *Roe v. Howard*, 917 F.3d 229 (2019), to be more in line with the text of the TVPRA …

*Abernathy*, 2024 WL 5331993 at *12. Judge Berman Jackson was correct, and – with all of the enormous respect for Judge Nichols that he is due – Judge Nichols' outlier view was and is wrong.

Indeed, Section 1595 does not operate *extraterritorially* at all. Section 1595 operates entirely within the United States, by opening U.S. courts to victims of TVPA violations. 18 U.S.C. § 1595. The sole predicate required for such access is that the plaintiff be a "victim of a violation of [Chapter 77]." *Id.* While Gaiman analogizes that to the civil remedies provision of RICO, that analogy does not hold; RICO's civil remedies provision incorporated a substantive element beyond mere victimization: the Plaintiff had to also have been "injured in his business or property by reason of the violation." 18 U.S.C. § 1694(c). The question of what injury was sufficient thus required an independent extraterritoriality analysis: "by cabining RICO's private cause of action to particular kinds of injury—excluding, for example, personal injuries—Congress signaled that the civil remedy is not coextensive with § 1962's substantive prohibitions." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 350 (2016). The TVPA, in contrast, opens the courts to any victim of a violation, a class expressly coextensive with Chapter 77's substantive provisions. The TVPA thus plainly allows foreign plaintiffs such as Scarlett to seek redress in U.S. courts for foreign human trafficking by U.S. citizens and permanent residents. Since Gaiman concedes that Scarlett otherwise sufficiently pled her human trafficking claims, his 12(b)(6) motion must be denied.

### III. <u>Defendant's Remaining Arguments Fail</u>

For the reasons set forth below, Defendant's remaining arguments are unavailing and cannot result in the dismissal of Scarlett's claims.

**A.      Prudential Exhaustion Does Not Apply to Scarlett's Claims**

The doctrine of prudential exhaustion has no application here; that doctrine applies to claims under "customary international law," not to claims for violations of *U.S.* law. *See Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 679 (7th Cir. 2012) (analyzing "does international law require plaintiffs to exhaust domestic remedies **before pursuing expropriation claims**") (emphasis added), *aff'd sub nom. Fischer v. Magyar Allamvasutak Zrt.*, 777 F.3d 847 (7th Cir. 2015). Unsurprisingly, each case Gaiman cites discusses prudential exhaustion in the context of claims arising under international law. *See Sosa v. Alvarez-Machain,* 542 U.S. 692, 733 n. 21 (2004) (there may be exhaustion requirement where claim is "for violations of customary international law"); *Sarei v. Rio Tinto, PLC*, 550 F.3d 822, 824 (9th Cir. 2008) (applying doctrine to claims for violation of international law brought under the Alien Tort Statute). Nor does the doctrine apply to claims against private litigants like Gaiman. *See Fischer*, 777 F.3d at 866 (affirming dismissal of claims against national bank and national railway based on prudential exhaustion, but dismissal of claim against private entity (Erste Bank) based only on *forum non conveniens*). The suggestion that prudential exhaustion is relevant here is false. The interests of justice strongly favor litigation in this District.

**B.      Application of Comity Does Not Result in Dismissal of Scarlett's Claims**

To the extent that Gaiman's reference to comity suggests that the U.S. has an interest in **not** having this dispute heard in U.S. courts, he is wrong.  The United States' articulated policy preferences discussed above establish the U.S. has a strong interest in hearing Scarlett's claims. Congress expressly crafted the TVPA to allow claims like Scarlett's to proceed against U.S. residents in U.S. District Courts. Defendant Gaiman is a resident of the district, and the claims alleged arise under U.S. law.  The parties do not reside in New Zealand and comity does not favor this District abstaining from hearing Scarlett's U.S. based claims against a U.S. resident, especially in light of the TVPA's grant of extra-territorial jurisdiction as discussed more fully above.

C.      **This Court Should Maintain Jurisdiction Over Scarlett's State Law Claims**

Defendant Gaiman admits that this Court has supplemental jurisdiction over Scarlett's state law tort claims (assault, battery, negligent infliction of emotional distress, and intentional infliction of emotional distress) under 18 U.S.C. § 1367(a) but argues that in the event the Court were to dismiss Scarlett's TVPA claim, the Court "must" dismiss Scarlett's state law claims.  However, Defendant Gaiman acknowledges and cites to § 1367(c)(3), which states that the district courts "may" decline to exercise supplemental jurisdiction over a claim of subsection (a) if the district court has dismissed all claims over which it was original jurisdiction.  As stated herein, Scarlett's TVPA claim states a proper legal claim and should not be dismissed, however Scarlett acknowledges the Court has discretion to discontinue exercising its supplemental jurisdiction but, it is not required to dismiss Scarlett's state law claims as Defendant Gaiman suggests.  Scarlett's common law tort claims are properly and timely pled against a resident of Wisconsin.  Given the nature of the allegations and the diversity of the residency of the parties, in the event the Court disagrees that Scarlett's TVPA claim should not be dismissed, Scarlett requests the Court exercise its discretion to maintain its jurisdiction over her state law claims.

<u>**CONCLUSION**</u>

In sum, the motion should be denied in its entirety. Substantively, Gaiman is correct that his conduct alleged in the complaint constitutes the criminal offense of human trafficking under the TVPA, and therefore wrong when he suggests that Section 1595 does not grant Scarlett the ability to seek redress for Gaiman's human trafficking in a U.S. court. And, precisely because it does, Gaiman's *forum non conveniens* motion is doomed; the private interest factors would need to overwhelmingly favor dismissal to overcome America's strong public policy interest in allowing victims like Scarlett to sue traffickers like Gaiman in U.S. courts. Not only did Gaiman fail to carry that heavy burden, but the balance of the private interest factors favors retaining jurisdiction in

Wisconsin, particularly in light of Gaiman being physically located in Wisconsin and the disparity in resources between Gaiman and Scarlett. Dismissal in favor of proceedings in New Zealand would be contrary to the interests of justice and thus should be rejected.

Finally, a word on Gaiman's suggestion that Scarlett brought this action as a "strike suit". Filing a lawsuit in a public forum where the intimate details of sexual assault and abuse are out in the open is unimaginably difficult for a victim such as Scarlett.  The emotional pain and anxiety that results from the litigation keeps wounds open and continually re-traumatizes victims.  Scarlett brought this action for only two reasons: first, because Gaiman's vicious sexual abuse entitles her to meaningful relief, and second, she wants her story heard in hopes of preventing, to the extent it can, Gaiman from catching his next victim unawares. Achieving those objectives will take significant time, effort, and emotional distress. For the reasons set forth herein, Defendant Gaiman's Motion should be denied in full, so that Scarlett can proceed towards accomplishing them.

Dated: April 11, 2025

Respectfully submitted,

/s/ Michael Nimmo
Michael Nimmo (Pro Hac Vice)
**WAHLBERG, WOODRUFF, NIMMO &
SLOANE, LLP**
4601 DTC Blvd., Suite 950
Denver, CO 80237
Phone: 303-571-5302
Michael@denvertriallawyers.com

Lane A. Haygood (Pro Hac Vice)
Dylan Schmeyer (Pro Hac Vice)
Thomas Neville (Pro Hac Vice)
Akiva M. Cohen (Pro Hac Vice)
**KAMERMAN UNCYK SONIKER &
KLEIN, P.C.**
1700 Broadway

New York, NY 10019
Phone: 212-400-4930
lhaygood@kusklaw.com
dschmeyer@kusklaw.com
tneville@kusklaw.com
acohen@kusklaw.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have served a copy of the foregoing via the Court's ECF system to:

Stephen E. Kravit
Brian T> Fahl
Wesley E. Haslam
Andrea N. Panozzo
Kravit, Hovel & Kraczyk s.c.
825 North Jefferson Street, Suite 500
Milwaukee, Wisconsin 53202

Andrew B. Brettler
Jake A. Camara
Berk Brettler LLP
9119 West Sunset Boulevard
West Hollywood, California 90069

*Attorneys for Defendant Neil Gaiman*

Dated:   April 11, 2025.


*/s/ Thomas D. Neville*
Thomas D. Neville